STEPHEN A. HIGGINSON, Circuit Judge:
This appeal requires us to consider the United States Fish and Wildlife Service’s inclusion of private land in a critical-habitat designation under the Endangered Species Act. Misconceptions exist about how critical-habitat designations impact private property. Critical-habitat designations do not transform private land into wildlife refuges. A designation does not authorize the government or the public to access private lands. Following designation, the Fish and Wildlife Service cannot force private landowners to introduce endangered species onto their land or to make modifications to their land. In short, a critical-habitat designation alone does not require private landowners to participate in the conservation of an endangered species. In a thorough opinion, District Judge Martin L.C. Feldman held that the Fish and Wildlife Service properly applied the Endangered Species Act to private land in St. Tammany Parish, Louisiana. As we discuss below, we AFFIRM Judge Feldman’s judgment upholding this critical-habitat designation.
FACTS AND PROCEEDINGS
This case is about a frog — the Rana sevosa — commonly known as the dusky gopher frog.[1] These frogs spend most of their lives underground in open-canopied pine forests.[2] They migrate to isolated, ephemeral ponds to breed. Final Designation, 77 Fed. Reg. at 35,129. Ephemeral ponds are only seasonally flooded, leaving them to dry out cyclically and making it impossible for predatory fish to survive. See id. at 35,129, 35,131. After the frogs are finished breeding, they return to their underground habitats, followed by their offspring. Id. at 35,129. When the dusky gopher frog was listed as an endangered species, there were only about 100 adult frogs known to exist in the wild.[3] Although, historically, the frog was found in parts of Louisiana, Mississippi, and Alabama, today, the frog exists only in Mississippi. Final Rule, 66 Fed. Reg. at 62,993-94; Final Designation, 77 Fed. Reg. at 35,132. The primary threat to the frog is habitat degradation. Final Rule, 66 Fed. Reg. at 62,994.
*459 In 2010, under the Endangered Species Act (“ESA”), 16 U.S.C. §§ 1531-1544, the United States Fish and Wildlife Service (“the Service”)[4] published a proposed rule to designate 1,957 acres in Mississippi as “critical habitat” for the dusky gopher frog.[5] In response to concerns raised during the peer-review process about the sufficiency of this original proposal, the Service’s final designation of critical habitat expanded the area to 6,477 acres in four counties in Mississippi and one parish in Louisiana. See Revised Proposal, 76 Fed. Reg. at 59,776; Final Designation, 77 Fed. Reg. at 35,118-19. The designated area in Louisiana (“Unit 1”) consists of 1,544 acres in St. Tammany Parish. Final Designation, 77 Fed. Reg. at 35,118. Although the dusky gopher frog has not occupied Unit 1 for decades, the land contains historic breeding sites and five closely clustered ephemeral ponds. See Revised Proposal, 76 Fed. Reg. at 59,783; Final Designation, 77 Fed. Reg. at 35,123-24, 35,133, 35,135. The final critical-habitat designation was the culmination of two proposed rules, economic analysis, two rounds of notice and comment, a scientific peer-review process including responses from six experts, and a public hearing. See Final Designation, 77 Fed. Reg. at 35,119.
Together, Plaintiffs-Appellants Markle Interests, L.L.C., P&F Lumber Company 2000, L.L.C., PF Monroe Properties, L.L.C., and Weyerhaeuser Company (collectively, “the Landowners”) own all of Unit 1. Weyerhaeuser Company holds a long-term timber lease on all of the land that does not expire until 2043. The Landowners intend to use the land for residential and commercial development and timber operations. Through consolidated suits, all of the Landowners filed actions for declaratory judgment and injunctive relief against the Service, its director, the Department of the Interior, and the Secretary of the Interior. The Landowners challenged only the Service’s designation of Unit 1 as critical habitat, not the designation of land in Mississippi.
The district court allowed the Center for Biological Diversity and the Gulf Restoration Network (collectively, “the Interve-nors”) to intervene as defendants in support of the Service’s final designation. All parties filed cross-motions for summary judgment. Although Judge Feldman granted summary judgment in favor of the Landowners on the issue of standing, he granted summary judgment in favor of the Service on the merits. See Markle Interests, LLC v. U.S. Fish & Wildlife Serv., 40 F.Supp.3d 744, 748, 769 (E.D. La. 2014). The Landowners timely appealed.
STANDARD OF REVIEW
We review a district court’s grant of summary judgment de novo. Nola Spice Designs, L.L.C. v. Hay del Enters., Inc., 783 F.3d 527, 536 (5th Cir. 2015); see also Sabine River Auth. v. U.S. Dep’t of Interior, 951 F.2d 669, 679 (5th Cir. 1992) (noting that the court of appeals reviews the administrative record de novo when the district court reviewed an agency’s decision by way of a motion for summary judgment). Our review of the Service’s ad *460 ministration of the ESA is governed by the Administrative Procedure Act (“APA”). See Bennett v. Spear, 520 U.S. 154, 171-75, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (holding that a claim challenging the Service’s alleged “maladministration of the ESA” is not reviewable under the citizen-suit provisions of the ESA, but is reviewable under the APA); see also 5 U.S.C. §§ 702, 704. When reviewing agency action under the APA, this court must “set aside agency action, findings, and conclusions found to be&emdash;(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations.” 5 U.S.C. § 706(2).
Review under the arbitrary-and-capricious standard is “extremely limited and highly deferential,” Gulf Restoration Network v. McCarthy, 783 F.3d 227, 243 (5th Cir. 2015) (internal quotation marks omitted), and “there is a presumption that the agency’s decision is valid,” La. Pub. Serv. Comm’n v. F.E.R.C., 761 F.3d 540, 558 (5th Cir. 2014) (internal quotation marks omitted). The plaintiff has the burden of overcoming the presumption of validity. La. Pub. Serv. Comm’n, 761 F.3d at 558.
Under the arbitrary-and-capricious standard,
we will not vacate an agency’s decision unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
Nat’l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (internal quotation marks omitted). We must be mindful not to substitute our judgment for the agency’s. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). That said, we must still ensure that “[the] agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.” Id. (internal quotation marks omitted). “We will uphold an agency’s action if its reasons and policy choices satisfy minimum standards of rationality.” 10 Ring Precision, Inc. v. Jones, 722 F.3d 711, 723 (5th Cir. 2013) (internal quotation marks omitted).
DISCUSSION
The Landowners raise three challenges to the Service’s designation of Unit 1 as critical habitat for the dusky gopher frog. They argue that the designation (1) violates the ESA and the APA, (2) exceeds the Service’s constitutional authority under the Commerce Clause, U.S. Const, art. I, § 8, cl. 3, and (3) violates the National Environmental Policy Act (“NEPA”), 42 U.S.C. § 4321 et seq. As we discuss below, each of their arguments fails.
I. Endangered Species Act
Congress enacted the ESA “to provide a means whereby the ecosystems upon which endangered species ... depend may be conserved” and “to provide a program for the conservation of such endangered species.” 16 U.S.C. § 1531(b). The ESA broadly defines “conservation.” It includes “the use of all methods and procedures which are necessary to bring any endangered species ... to the point at which the measures provided [by the ESA] are no longer necessary.” Id. § 1532(3). In other words, “the objective of the ESA is *461 to enable [endangered] species not merely to survive, but to recover from their endangered or threatened status.” Sierra Club v. U.S. Fish & Wildlife Serv., 245 F.3d 434, 438 (5th Cir. 2001); see also Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (“The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.”).
To achieve this objective, the ESA requires the Service to first identify and list endangered and threatened species. See 16 U.S.C. § 1533(a)(1). Listing a species as endangered or threatened then triggers the Service’s statutory duty to designate critical habitat “to the maximum extent prudent and determinable.” See id. § 1533(a)(3)(A)(i).[6] “Critical habitat designation primarily benefits listed species through the ESA’s [Section 7] consultation mechanism.” Sierra Club, 245 F.3d at 439; see 16 U.S.C. § 1536 (describing the Section 7 consultation process). Under this section, once habitat is designated as critical, federal agencies are prohibited from authorizing, funding, or carrying out any action that is likely to result in “the destruction or adverse modification” of that critical habitat without receiving a special exemption.[7] 16 U.S.C. § 1536(a)(2). To satisfy the requirements of Section 7, federal agencies must consult with the Service before taking any action that might negatively affect critical habitat.[8] Only federal agencies — not private parties — must engage in this Section 7 consultation process. See id.; 50 C.F.R. § 402.14(a). Thus, as Judge Feldman explained, “absent a federal nexus, [the Service] cannot compel a private landowner to make changes to restore his designated property into optimal habitat.” Markle Interests, 40 F.Supp.3d at 750.
A. Standing
Before addressing the merits of the Service’s critical-habitat designation, we first address whether the Landowners have standing to challenge the designation. “The question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.” Bennett, 520 U.S. at 162, 117 *462 S.Ct. 1154 (internal quotation marks omitted). In particular, to establish standing under the APA, in addition to Article III standing, a plaintiff must show that “the interest sought to be protected by the [plaintiff] is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” Id. at 175, 117 S.Ct. 1154 (quoting Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct, 827, 25 L.Ed.2d 184 (1970)). Although the district court correctly held that the APA provided the proper vehicle for the Landowners to challenge the Service’s administration of the ESA, the district court did not address the APA’s zone-of-interests test; instead, it held only that the Landowners have standing under Article III. On appeal, the Service did not brief the zone-of-interests issue or challenge the district court’s conclusion that the Landowners have Article III standing.
Even though the Service did not appeal the district court’s standing conclusion, we must independently assess the Landowners’ Article III standing.[9] See Hang On, Inc. v. City of Arlington, 65 F.3d 1248, 1251 (5th Cir. 1995) (“The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.” (alterations and internal quotation marks omitted)). “Article III of the Constitution limits federal courts’ jurisdiction to certain ‘Cases’ and ‘Controversies.’ ” Clapper v. Amnesty Int’l USA, — U.S. -, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013). “To satisfy the ‘case’ or ‘controversy’ requirement of Article III, which is the ‘irreducible constitutional minimum’ of standing, a plaintiff must ... demonstrate that he has suffered ‘injury in fact,’ that the injury is ‘fairly traceable’ to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.” Bennett, 520 U.S. at 162, 117 S.Ct. 1154 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The injury must be concrete and particularized, as well as actual or imminent. Lujan, 504 U.S. at 560, 112 S.Ct. 2130; see also Crane v. Johnson, 783 F.3d 244, 251 (5th Cir. 2015) (“Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is certainly impending.”). “The party invoking federal jurisdiction bears the burden of establishing these elements.” Lujan, 504 U.S. at 561,112 S.Ct. 2130.
Here, the Landowners assert two alleged injuries: lost future development and lost property value. The first — loss of future development — is too speculative to support Article III standing. Although “[a]n increased regulatory burden typically satisfies the injury in fact requirement,” Contender Farms, L.L.P. v. U.S. Dep’t of Agric., 779 F.3d 258, 266 (5th Cir. 2015), any regulatory burden on Unit 1 is purely speculative at this point. As the Service emphasized in the designation, if future development occurring on Unit 1 avoids impacting jurisdictional wetlands, no federal permit would be required and the ESA’s Section 7 consultation process would not be triggered. See Final Designation, 77 Fed. Reg. at 35,126 (noting that the range of possible economic impact to Unit 1 of $0 to $33.9 million “reflects uncertainty regarding future land use”); id. at 35,140 (observing that “considerable uncertainty *463 exists regarding the likelihood of a Federal nexus for development activities [in Unit 1]”); see also 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Judge Feldman similarly stressed this point, explaining that, “if a private party’s action has no federal nexus (if it is not authorized, funded, or carried out by a federal agency), no affirmative obligations are triggered by the critical habitat designation.” Markle Interests, 40 F.Supp.3d at 750.
Because the Landowners have not provided evidence that specific development projects are likely to be impacted by Section 7 consultation,[10] lost future development is too speculative to support standing. See Lujan, 504 U.S. at 564, 112 S.Ct. 2130 (“Such ‘some da/ intentions — without any description of concrete plans, or indeed even any specification of when the some day will be — do not support a finding of the ‘actual or imminent’ injury that our cases require.”); see also Clapper, 133 S.Ct. at 1147-48 (holding that plaintiffs did not have standing to challenge the Foreign Intelligence Surveillance Act in part because they provided no evidence supporting their “highly speculative fear” that the government would imminently target communications to which plaintiffs were parties); Crane, 783 F.3d at 252 (holding that Mississippi did not have standing to challenge the federal government’s deferred-action policy because its injury was “purely speculative” and because it failed to “produce evidence of costs it would incur” because of the policy); cf. Cape Hatteras Access Pres. Alliance v. U.S. Dep’t of Interior, 344 F.Supp.2d 108, 117-18 (D.D.C. 2004) (holding that the burdens of Section 7 consultation supported standing when the plaintiffs identified specific, ongoing development projects that would be delayed because of the consultation requirement).
The Landowners’ assertion of lost property value, by contrast, is a concrete and particularized injury that supports standing. See Sabine River Auth, 951 F.2d at 674 (recognizing that injury in fact includes economic injury). The Landowners assert that their land has already lost value as a result of the critical-habitat designation. Indeed, as the Service recognized in its Final Economic Analysis, given the “stigma” attached to critical-habitat designations, “[p]ublic attitudes about the limits or restrictions that critical habitat may impose can cause real economic effects to property owners, regardless of whether such limits are actually imposed.” As a result, “a property that is designated as critical habitat may have a lower market value than an identical property that is not within the boundaries of critical habitat due to perceived limitations or restrictions.” The Service further assumed that “any reduction in land value due to the designation of critical habitat will happen immediately at the time of the designation.”
Causation and redressability flow naturally from this injury. If a plaintiff — or, here, the plaintiffs’ land — is the object of government action, “there is ordinarily little question that the action ... has caused him injury, and that a judgment preventing ... the action will redress it.” Lujan, *464 504 U.S. at 561-62, 112 S.Ct. 2130. We conclude that the Landowners’ decreased property value is fairly traceable to the Service’s critical-habitat designation and that this injury would likely be redressed by a favorable decision. Thus, the Landowners have established Article III standing based on lost property value.
The question nevertheless remains whether the Landowners satisfy the APA’s zone-of-interests requirement. See Bennett, 520 U.S. at 175-77, 117 S.Ct. 1154. The Service, however, has not argued&emdash;either in the district court or this court&emdash;that the Landowners’ interests fall outside the zone of interests that the ESA is designed to protect. “Unlike constitutional standing, prudential standing arguments may be waived.” Bd. of Miss. Levee Comm’rs v. EPA, 674 F.3d 409, 417-18 (5th Cir. 2012).[11] Although we have previously considered the zone-of-interests issue sua sponte, see Nat’l Solid Waste Mgmt. Ass’n v. Pine Belt Reg’l Solid Waste Mgmt. Auth., 389 F.3d 491, 498 (5th Cir. 2004), we decline to do so here. Because the Service failed to raise this argument, we hold that the Service has forfeited a challenge to the Landowners’ standing under the zone-of-interests test. We thus conclude that the Landowners have standing to challenge the Service’s critical-habitat designation.
B. Critical-Habitat Designation
The ESA expressly envisions two types of critical habitat: areas occupied by the endangered species at the time it is listed as endangered and areas not occupied by the species at the time of listing. See 16 U.S.C. § 1532(5)(A)(i)-(ii). To designate an occupied area as critical habitat, the Service must demonstrate that the area contains “those physical or biological features ... essential to the conservation of the species.”[12] Id. § 1532(5)(A)(i). To designate unoccupied areas, the Service must determine that the designated areas are “essential for the conservation of the species.” Id. § 1532(5)(A)(ii). As Judge Feldman noted below, “Congress did not define ‘essential’ but, rather, delegated to the Secretary the authority to make that determination.” Markle Interests, 40 F.Supp.3d at 760. Thus, when the Service promulgates, in a formal rule, a determination that an unoccupied area is “essential for the conservation” of an endangered species, Chevron deference is appropriate. See id. (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); Knapp v. U.S. Dep’t of Agric., 796 F.3d 445, 454 (5th Cir. 2015) (“[Administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears [ (1) ] that Congress delegated authority to the agency generally to make rules carrying the force *465 of law, and [ (2) ] that the agency interpretation claiming deference was promulgated in the exercise of that authority.” (alterations in original)).
The Service must designate critical habitat “on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat.” Id. § 1533(b)(2). “When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.” Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); Medina Cnty. Envtl. Action Ass’n v. Surface Tramp. Bd., 602 F.3d 687, 699 (5th Cir. 2010) (“Where an agency’s particular technical expertise is involved, we are at our most deferential in reviewing the agency’s findings.”).
In addition, under the regulations in place at the time of the critical-habitat designation at issue here, before the Service could designate unoccupied land as critical habitat, it first had to make a finding that “a designation limited to [a species’] present range would be inadequate to ensure the conservation of the species.” 50 C.F.R. § 424.12(e) (2012) (emphasis added). Unit 1 is unoccupied. Thus, under its own regulations, the Service first had to make an inadequacy determination. The Service’s first proposed designation included only land in Mississippi and did not include Unit 1. See Original Proposal, 75 Fed. Reg. at 31,395-99 (identifying eleven units in Mississippi). During the peer-review and comment process on this original proposal, the expert reviewers expressed that the designated habitat in the proposal was inadequate to ensure the conservation of the frog. The experts therefore urged the Service to expand the designation to Louisiana or Alabama, the two other states in the frog’s historical range. See Revised Proposal, 76 Fed. Reg. at 59,776; Final Designation, 77 Fed. Reg. at 35,119, 35,-121, 35,123-24.
The Service adopted this consensus expert conclusion, finding that designating the occupied land in Mississippi was “not sufficient to conserve the species.” Final Designation, 77 Fed. Reg. at 35,123. The Service explained that “[r]ecovery of the dusky gopher frog will not be possible without the establishment of additional breeding populations of the species,” and it emphasized that it was necessary to designate critical habitat outside of Mississippi to protect against potential local events, such as drought and other environmental disasters. Id. at 35,124-25. The Service therefore determined that “[a]dditional areas that were not known to be occupied at the time of listing are essential for the conservation of the species.” Id. at 35,123. In sum, all of the experts agreed that designating occupied land alone would not be sufficient to conserve the dusky gopher frog. Thus, the Service’s prerequisite inadequacy finding — a finding that the Landowners did not challenge[13] — was not arbitrary and capricious.
*466 Having satisfied this preliminary requirement, the Service was next required to limit the critical-habitat designation to unoccupied areas that are “essential for the conservation of the species.” 16 U.S.C. § 1532(5)(A)(ii). The Service focused its resources on locating additional ephemeral ponds. It explained that it prioritized ephemeral ponds because of their rarity and great importance for breeding, and because they are very difficult to replicate artificially. See Final Designation, 77 Fed. Reg. at 35,123-24. The Service further explained that additional breeding populations are necessary for the frog’s recovery' and to prevent excessive inbreeding. See id. at 35,121, 35,123-24. Although the Service has created one artificial ephemeral pond in the DeSoto National Forest in Mississippi, this artificial pond took ten years to construct, and it is still unclear whether it will be successful as a breeding site. See id. at 35,123. In contrast, as an expert explained at the public hearing on the Revised Proposal, it is “much easier to restore a terrestrial habitat for the gopher frog than to restore or build breeding ponds.” See also id. at 35123 (“Isolated, ephemeral ponds that can be used as the focal point for establishing these populations are rare, and this is a limiting factor in dusky gopher frog recovery.”). As the Service explained in the Final Designation, “[although [DeSoto] is crucial to the survival of the frog because the majority of the remaining frogs occur there, recovery of the species will require populations of dusky gopher frog distributed across a broader portion of the species’ historic distribution.” Id. at 35,125.
The Service therefore searched for isolated, ephemeral ponds within the historical range of the frog in Alabama and Louisiana. See Final Designation, 77 Fed. Reg. at 35,124. The area in Alabama where the frog once lived has since been replaced by a residential development. See id. The Service noted that it was unable to find any breeding sites that the frog might use in the future in Alabama. See id. In contrast, the Service explained that Unit l’s five ephemeral ponds are “intact and of remarkable quality.” Id. at 35,133. It noted that the ponds in Unit 1 “are in close proximity to each other, which would allow movement of adult gopher frogs between them” and would “provide metapopulation structure that supports long-term survival and population resiliency.” Id. “Based on the best scientific information available to the Service,” the Service concluded that “the five ponds in Unit 1 provide breeding habitat that in its totality is not known to be present elsewhere within the historic range of the dusky gopher frog.” Id. at 35,124.
Finally, in addition to ephemeral ponds, dusky gopher frogs also require upland forested habitat and connected corridors that allow them to move between their breeding and nonbreeding habitats. See id. at 35,131-32. Looking to the upland terrestrial habitat surrounding Unit l’s ephemeral ponds, the Service relied on scientific measurements and data to draw a boundary around Unit 1. The Service used digital aerial photography to map the ponds and then to delineate critical-habitat units by demarcating a buffer zone around the ponds by a radius of 621 meters (or 2,037 feet). Id. at 35,134. This value, which was based on data collected during multiple gopher frog studies, represented the median farthest distance that frogs had traveled from breeding sites (571 meters or 1,873 feet) plus an extra 50 meters (or 164 feet) “to minimize the edge effects of the surrounding land use.” Id. The Service finally used aerial imagery to connect eriti *467 cal-habitat areas that were within 1,000 meters (or 3,281 feet) 'of each other “to create routes for gene flow between breeding sites and metapopulation structure.” Id.
Altogether, the Service concluded:
Unit 1 is essential to the conservation of the dusky gopher frog because it provides: (1) Breeding habitat for the dusky gopher frog in a landscape where the rarity of that habitat is a primary threat to the species; (2) a framework of breeding ponds that supports metapopulation structure important to the long-term survival of the dusky gopher frog; and (3) geographic distance from extant dusky gopher frog populations, which likely provides protection from environmental stoehasticity.
Id. As Judge Feldman reasoned below, “[the Service’s] finding that the unique ponds located on Unit 1 are essential for the frog’s recovery is supported by the ESA and by the record; it therefore must be upheld in law as a permissible interpretation of the ESA.” Markle Interests, 40 F.Supp.3d at 761 (applying Chevron deference).
On appeal, the Landowners do not dispute the scientific or factual support for the Service’s determination that Unit 1 is essential.[14] Instead, they argue that the Service “exceeded its statutory authority” under the ESA and acted arbitrarily and capriciously when it designated Unit 1 as critical habitat because Unit 1 is not currently habitable, nor “currently supporting the conservation of the species in any way,” nor reasonably likely to support the conservation of the species in the “foreseeable future.” They contend that such land cannot rationally be called “essential for the conservation of the species,” because if it can be, then the Service would have “nearly limitless authority to burden private lands with a critical habitat designation.”
As Judge Feldman noted, Congress has not defined the word “essential” in the ESA. Hence the Service has the authority to interpret the term. See Sierra Club, 245 F.3d at 438 (“Once a species has been listed as endangered ... the ESA states that the Secretary ‘shall’ designate a critical habitat ‘to the maximum extent prudent or determinable.’ The ESA leaves to the Secretary the task of defining ‘prudent’ and ‘determinable.’ ” (quoting 16 U.S.C. § 1533(h))). To issue a formal rule designating critical habitat for the frog, the Service necessarily had to interpret and apply the applicable ESA provisions, including the word “essential.” See Nat’l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 420, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) (“[W]e defer to an interpretation which was a necessary presupposition of the [agency]’s decision.”); cf. S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 596 & n. 13 (5th Cir. 2004) (explaining that, when the Centers for Medicare and Medicaid Services are charged with reviewing and approving state Medicaid plans to ensure that the plans conform to the Act, the agency implicitly interprets the Act when granting approvals). The Service issued the designation as a formal agency rule after two rounds of notice and comment. Thus, the Service’s interpretation of the term “essential” is entitled to Chevron deference. See Home Builders, 551 U.S. at 665, 127 S.Ct. 2518 (applying Chevron deference in the context of the ESA); Chevron, 467 U.S. at 842-44, 104 S.Ct. 2778.
*468 When, as here, “an agency’s decision qualifies for Chevron deference, we will accept the agency’s reasonable construction of an ambiguous statute that the agency is charged with administering.” Knapp, 796 F.3d at 455. The question presented, then, is whether the Landowners have demonstrated that the Service interpreted the ESA unreasonably when it deemed Unit 1 “essential” for the conservation of the dusky gopher frog. Although the Landowners acknowledge that “the Service undoubtedly has some discretion in interpreting the statutory language of the ESA,” they contend that the Service “does not have the authority to apply the term ‘essential’ in a way that is contrary to its plain meaning.” The Landowners do not explain what they think the “plain meaning” of essential is, however, save to argue, circularly, that we must “insist! ]” that “ ‘essential’ must truly mean essential.”[15]
We consider first their argument that it is an unreasonable interpretation of the ESA to describe Unit 1 as essential for the conservation of the dusky gopher frog when Unit 1 is not currently habitable by the frog. The statute does not support this argument. There is no habitability requirement in the text of the ESA or the implementing regulations. The statute requires the Service to designate “essential” areas, without further defining “essential” to mean “habitable.” See Bear Valley Mut. Water Co. v. Jewell, 790 F.3d 977, 994 (9th Cir. 2015) (upholding the designation of unoceupied critical habitat, even though the area was not habitable by the endangered species). The Landowners’ proposed extra-textual limit on the designation of unoccupied land — habitability—effectively conflates the standard for designating unoccupied land with the standard for designating occupied land. See Dep’t of Homeland Sec. v. MacLean, — U.S.-, 135 S.Ct. 913, 919, 190 L.Ed.2d 771 (2015) (“Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.”). As Judge Feldman insightfully observed, “[their position] is ... contrary to the ESA; [the Landowners] equate what Congress plainly differentiates: the ESA defines two distinct types of critical habitat, occupied and unoccupied; only occupied habitat must contain all of the relevant [physical or biological features].” Markle Interests, 40 F.Supp.3d at 761. Thus, the plain text of the ESA does not require Unit 1 to be habitable. “[R]ather,” as Judge Feldman elaborated, “[the Service] is tasked with designating as critical unoccupied habitat so long as it determines it is ‘essential for the conservation of the species’ and ‘only when a designation limited to its present range would be inadequate to ensure the conservation of the species.’ ” Id. at 762 (quoting 50 C.F.R. § 424.12(e)). Here, the Service provided scientific data to support its finding that Unit 1 is essential, and as Judge Feldman held, “[the Landowners] have not demon *469 strated that [the Service’s] findings are implausible.” Id. Thus, the Landowners have not shown that the Service employed an unreasonable interpretation of the ESA when it found that the currently uninhabitable Unit 1 was essential for the conservation of the dusky gopher frog and designated the land as critical habitat.
We consider next the argument that it is an unreasonable interpretation of the ESA to describe Unit 1 as essential for the conservation of the dusky gopher frog when Unit 1 “is not currently supporting the conservation of the species in any way and the Service has no reasonable basis to believe that it will do so at any point in the foreseeable future.” Like their proposed habitability requirement, the Landowners’ proposed temporal requirement — considering whether the frog can live on the land “currently” or in the “foreseeable future” — also lacks legal support and is undermined by the ESA’s text. The ESA’s critical-habitat provisions do not require the Service to know when a protected species will be conserved as a result of the designation. The Service is required to designate unoccupied areas as critical habitat if these areas are “essential for the conservation of the species.” 16 U.S.C. § 1532(5)(A)(ii). The statute defines “conservation” as “the- use of all methods and procedures which are necessary to bring any endangered species ... to the point at which the measures provided ... are no longer necessary.” Id. § 1532(3); cf. Alaska Oil & Gas Ass’n v. Jewell, 815 F.3d 544, 555 (9th Cir. 2016) (“The Act is concerned with protecting the future of the species[J”). Neither of these provisions sets a deadline for achieving this ultimate conservation goal. See Home Builders Ass’n of N. Cal. v. U.S. Fish & Wildlife Serv., 616 F.3d 983, 989 (9th Cir. 2010) (holding that the Service need not determine “exactly when conservation will be complete” before making a critical-habitat designation). And the Landowners do not explain why it is impossible to make an essentiality determination without determining when (or whether) the conservation goal will be achieved. See id.. (“A seller of sporting goods should be able to identify which rod and reel are essential to catching a large-mouth bass, but is not expected to predict when the customer will catch one.”). As Judge Feldman concluded, “[the Service’s] failure (as yet) to identify how or when a viable population of dusky gopher frogs will be achieved, as indifferent and overreaching by the government as it appears, does not serve to invalidate its finding that Unit 1 was part of the minimum required habitat for the frog’s conservation.” Marble Interests, 40 F.Supp.3d at 762-63. We also note that, in contrast to the habitat-designation provision at issue here, the ESA’s recovery-plan provisions do require the Sendee to estimate when a species will be conserved. See 16 U.S.C. § 1533(f)(l)(B)(iii). Congress’s inclusion of a conservation-timeline requirement for recovery plans, but omission of it for critical-habitat designations, further underscores the weakness of the Landowners’ argument. See MacLean, 135 S.Ct. at 919.[16]
Moreover, we observe that the Landowners’ proposed temporal requirement could effectively exclude all private land not currently occupied by the species from *470 critical-habitat designations. By the Landowners’ logic, private landowners could trump the Service’s scientific determination that unoccupied habitat is essential for the conservation of a species so long as they declare that they are not currently willing to modify habitat to make it habitable and that they will not be willing to make modifications in the foreseeable future. Their logic would also seem to allow landowners whose land is immediately habitable to block a critical-habitat designation merely by declaring that they will not — now or ever — permit the reintroduction of the species to their land. The Landowners’ focus on private-party cooperation as part of the definition of “essential” finds no support in the text of the ESA. Nothing in the ESA requires that private landowners be willing to participate in species conservation.[17] Summing up the Landowners’ arguments on this point, Judge Feldman observed that the Landowners “effectively ask the Court to endorse — contrary to the express terms and scope of the statute — a private landowner exemption from unoccupied critical-habitat designations. This, the Third Branch, is the wrong audience for addressing this matter of policy.” Markle Interests, 40 F.Supp.3d at 769 n. 40. We agree. Thus, the Landowners have not shown that the Service employed an unreasonable interpretation of the ESA when it found that Unit 1 was essential for the conservation of the dusky gopher frog without first establishing that Unit 1 currently supports, or in the “foreseeable future” will support, the conservation of the dusky gopher frog.
We next consider the argument that that the Service has interpreted the word “essential” unreasonably because its interpretation fails to place “meaningful limits” on the Service’s power under the ESA. Thus, we consider whether, in designating Unit 1, the Service abided the meaningful limits that the ESA and the agency’s implementing regulations set on the Service’s authority to designate unoccupied areas as critical habitat. Under the regulations in effect at the time that Unit 1 was designated, the Service had to find that the species’s occupied habitat was inadequate before it could even consider designating unoccupied habitat as critical. 50 C.F.R. § 424.12(e). In part, this preliminary determination provided a limit to the term “essential” as it relates to unoccupied areas. Unoccupied areas could be essential only if occupied areas were found to be inadequate for conserving the species. See Bear Valley Mut. Water Co., 790 F.3d at 994 (recognizing that the inadequacy and essentiality requirements overlap). Here, the Service made that threshold inadequa *471 cy determination — a determination that the Landowners do not challenge.
Next, under the ESA itself, the Service can designate unoccupied land only if it is “essential for the conservation of the species.” 16 U.S.C. § 1532(5)(A)(ii). “Conservation” is defined as “the use of all methods and procedures which are necessary to bring any endangered species ... to the point at which the measures provided ... are no longer necessary.” Id. § 1532(3) (emphasis added). In light of this definition, we find implausible the Landowners’ parade of horribles in which they suggest that, if the Service can designate an area like Unit 1 as critical habitat, it could designate “much of the land in the United States” as well. They contend that “[b]e-cause any land may conceivably be turned into suitable habitat with enough time, effort, and resources, th[e] [Service’s] interpretation gives the Service nearly limitless authority to burden private lands with a critical habitat designation.” But we find it hard to see how the Service would be able to satisfactorily explain why randomly chosen land — whether an empty field or, as the Landowners suggest, land covered in “buildings” and “pavement” — would be any more “necessary” to a given species’ recovery than any other arbitrarily chosen empty field or paved lot.[18] Here, the Service confirmed through peer review and two rounds of notice and comment a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature — the ephemeral ponds — which justified its finding that Unit 1 was essential for the conservation of the dusky gopher frog.[19]
*472 In addition, the ESA requires the Service to base its finding of essentiality on “the best scientific data available.” Id. § 1533(b)(2). This requirement further cabins the Service’s power to make critical-habitat designations. Here, the Final Designation was based on the scientific expertise of the agency’s biologists and outside gopher frog specialists. If this scientific support were not in the record, the designation could not stand.[20] But that is not the situation here, and the Landowners do not challenge the consensus scientific data on which the Service relied. The Landowners have not shown that the Service employed an interpretation of the ESA that is inconsistent with the meaningful limits that the ESA and the agency’s implementing regulations set on the Service’s authority to designate unoccupied areas as critical habitat.[21]
In sum, the Landowners have not established that the Service interpreted the ESA unreasonably — and was thus undeserving of Chevron deference — when it found that Unit 1 was essential. for the conservation of the dusky gopher frog. Likewise, the Landowners have not shown that the Service’s essentiality finding failed to “satisfy minimum standards of rationality,” 10 Ring Precision, 722 F.3d at 723, which means that they have not shown that the Service acted arbitrarily or capriciously, either.
Finally, the Landowners contend that it is improper to protect Unit 1 with a critical-habitat designation when there are other ways to ensure that Unit 1 will assist with the conservation of the gopher frog. It is true that the Service could manage Unit 1 by purchasing the land. See 16 *473 U.S.C. § 1534(a). But the legal availability of other statutory conservation mechanisms, some arguably more intrusive of private property interests, does not undercut the Service’s separate statutory duty to designate as critical habitat unoccupied areas that are essential for the conservation of the species. - See id. § 1533(a)(3)(A)® (“The Secretary ... to the maximum extent prudent and determinable ... shall ... designate any habitat of [an endangered] species which is then considered to be critical habitat .... ” (emphasis added)).
In sum, the designation of Unit 1 as critical habitat was not arbitrary and capricious nor based upon an. unreasonable interpretation of the ESA. The Service reasonably determined (1) that designating occupied habitat alone would be inadequate to ensure the conservation of the dusky gopher frog and (2) that Unit 1 is essential for the conservation of the frog. We thus agree with Judge Feldman: “the law authorizes such action and ... the government has acted within the law.” Markle Interests, 40 F.Supp.3d at 759-60.
C. Decision Not to Exclude Unit 1
In addition to' attacking the Service’s conclusion that Unit 1 is essential for the conservation of the dusky gopher frog, the Landowners also challenge the Service’s conclusion that the economic impacts on Unit 1 are not disproportionate. See Final Designation, 77 Fed. Reg. at 35,141. The Landowners argue that because the benefits of excluding Unit 1 from the designation clearly outweigh the benefits of including it in the designation, the Service’s decision is arbitrary and capricious. The Landowners contend that because Unit 1 is not currently habitable by the dusky gopher frog, the land provides no biological benefit to the frog. They emphasize that Unit 1, by contrast, bears a potential loss of development value of up to $33.9 million over twenty years.
The ESA mandates that the Service “tak[e] into consideration the economic impact ... of specifying any particular area as critical habitat.” 16 U.S.C. § 1533(b)(2). After it takes this impact into consideration, the Service
may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it] determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.
Id. (emphasis added). The Service argues that once it has fulfilled its statutory obligation to consider economic impacts, a decision to not exclude an area is discretionary and thus not reviewable in court. The Service is correct. Under the APA, decisions “committed to agency discretion by law” are not reviewable in federal court. 5 U.S.C. § 701(a)(2). An action is committed to agency discretion when there is “no meaningful standard against which to judge the agency’s exercise of discretion.” Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). “[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for ‘abuse of discretion.’ ” Id.
The only other circuit court that has confronted this issue has recognized that there are no manageable standards for reviewing the Service’s decision not to exercise its discretionary authority to exclude an area from a critical-habitat designation. See Bear Valley Mut. Water Co., 790 F.3d at 989-90. It therefore held that the decision not to exclude is unreviewable. *474 Id.; see also Bldg. Indus. Ass’n of Bay Area v. U.S. Dep’t of Commerce, 792 F.3d 1027, 1034 (9th Cir.2015), aff'g No. C 11-41.18, 2012 WL 6002511 (N.D. Cal. Nov. 30, 2012).' Similarly, every district court that has addressed this issue has also held that the decision not to exclude is not subject to judicial review. See Aina Nui Corp. v. Jewell, 52 F.Supp.3d 1110, 1132 n. 4 (D. Haw. 2014) (“The Court does not review the Service’s ultimate decision not to exclude ..., which is committed to the agency’s discretion.”); Cape Hatteras Access Pres. Alliance v. U.S. Dep’t of Interior, 731 F.Supp.2d 15, 29 (D.D.C. 2010) (“The plain reading of the statute fails to provide a standard by which to judge the Service’s decision not to exclude an area from critical habitat.”); Home Builders Ass’n of N. Cal. v. U.S. Fish & Wildlife Serv., No. CIV. S-05-0629, 2006 WL 3190518, at *20 (E.D. Cal. Nov. 2, 2006) (“[T]he court has no substantive standards by which to review the [agency’s] decisions not to exclude certain tracts based on economic or other considerations, and those decisions are therefore committed to agency discretion.”).
We see no reason to chart a new path on this issue in concluding that we cannot review the Service’s decision not to exercise its discretion to exclude Unit 1 from the critical-habitat designation. Section 1533(b)(2) articulates a standard for reviewing the Service’s decision to exclude an area. But the statute is silent on a' standard for reviewing the Service’s decision to not exclude an area. Put another " way, the section establishes a discretionary process by which the Service may exclude areas from designation, but it does not articulate any standard governing when the Service must exclude an area from designation. See Bear Valley Mut. Water Co., 790 F.3d at 989 (“[W]here a statute is written in the permissive, an agency’s decision not to act is considered presumptively unreviewable because courts lack ‘a focus for judicial review ... to determine whether the agency exceeded its statutory powers.’ ” (quoting Heckler, 470 U.S. at 832, 105 S.Ct. 1649)). Thus, even were we to assume that the Landowners are correct that the economic benefits of exclusion outweigh the conservation benefits of designation, the Service is still not obligated to exclude Unit 1. That decision is committed to the agency’s discretion and is not reviewable.
The Supreme Court’s recent decision in Michigan v. EPA, — U.S.-, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015), does not compel a contrary conclusion. In Michigan, the Environmental Protection Agency (“EPA”) had interpreted a provision of the Clean Air Act to not require the consideration of costs when deciding whether to regulate hazardous emissions from power plants. Id. at 2706. Although the Supreme Court held that the EPA misinterpreted the statute, the Court emphasized that it was not requiring the agency “to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value.” Id. at 2711. The Court further explained that “[i]t will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost.” Id.
Unlike the provision of the Clean Air Act at issue in Michigan, the ESA explicitly mandates “consideration” of “economic impact.” 16 U.S.C. § 1533(b)(2); see Bennett, 520 U.S. at 172, 117 S.Ct. 1154. The Service fulfilled this requirement by commissioning an economic report by Industrial Economics, Inc. That analysis estimated the economic impact on Unit 1, and to further refine that analysis, it included three impact scenarios. The report noted that Unit 1 bears a potential loss of development value ranging from $0 *475 to $33.9 million over twenty years. See Final Designation, 77 Fed. Reg. at 35,140-41; This potential loss depends on a number of contingencies that may or may not arise, including future development projects, the nature of federal agency approval that is required for those projects, and possible limits that are imposed after any consultation that accompanies federal agency action. As has been recently recognized, the statute does not require a particular methodology for considering economic impact. See Bldg. Indus. Ass’n of Bay Area, 792 F.3d at 1032-34. And here on appeal, the Landowners do not challenge the methodology that the Service used when analyzing the economic impact on Unit 1; instead, the Landowners challenge the Service’s bottom-line conclusion not to exclude Unit 1 on the basis of that economic impact. That conclusion is not reviewable.
II. Commerce Clause
Having concluded that the Service’s designation of Unit 1 as critical habitat was not arbitrary and capricious, we must next consider the Landowners’ alternative argument that the ESA exceeds Congress’s powers under the Commerce Clause. The Commerce Clause gives Congress the power “[t]o regulate Commerce ... among the several States.” U.S. Const, art. I, § 8, el. 3. In United States v. Lopez, the Supreme Court defined three broad categories of federal legislation that are consistent with this power. 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). This case concerns the third Lopez category — that is, whether the federal action “substantially affect[s] interstate commerce.” Id. at 558-59, 115 S.Ct. 1624 (citations omitted).
The Landowners concede that, “properly limited and confined to the statutory definition,” the critical-habitat provision of the ESA is a constitutional exercise of Congress’s Commerce Clause authority. They maintain, however, that the designation of Unit 1 as critical habitat for the dusky gopher frog exceeds the scope of an otherwise constitutional power. Viewed this narrowly, the designation of Unit 1 is mirastate (not interstate) activity. The Landowners further argue that “[t]here is simply no rational basis to conclude that the use of Unit 1 will substantially affect interstate commerce.” In support of this narrow framing of the issue, the Landowners imply that it is inappropriate to aggregate the effect of designating Unit 1 with the effect of all other critical-habitat designations nationwide. Instead, the Landowners argue that we should analyze the commercial impact of the Unit 1 designation independent of all other designations. But as Judge Feldman explained, “each application of the ESA is not itself subject to the same tests for determining whether the underlying statute is a constitutional exercise of the Commerce Clause.” Markle Interests, 40 F.Supp.3d at 758. We agree with Judge Feldman that “the [Landowners’] constitutional claim is foreclosed by binding precedent.” Id.
The Supreme Court has outlined four considerations that are relevant when analyzing whether Congress can regulate purely intrastate activities under the third Lopez prong. See United States v. Morrison, 529 U.S. 598, 609-12, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). First, courts should consider whether the intrastate activity “in question has been some sort of economic endeavor.” Id. at 611, 120 S.Ct. 1740. Second, courts should consider whether there is an “express jurisdictional element” in the statute that might limit its application to instances that “have an explicit connection with or effect on interstate commerce.” Id. at 611-12, 120 S.Ct. 1740. The next consideration that should inform the analysis is legislative history *476 and congressional findings on the effect that the subject of the legislation has on interstate commerce. Id. at 612, 120 S.Ct. 1740. Finally, courts should evaluate whether the link between the intrastate activity and its effect on interstate commerce is attenuated. Id.' The Landowners’ constitutional challenge can be distilled to the question of whether we can properly analyze the Unit 1 designation aggregated with all other critical-habitat designations nationwide. This question falls under the first consideration articulated in Morrison. Because the Landowners concede that the critical-habitat provision of the ESA is “within the legitimate powers of Congress,” we need focus on only the first consideration if we find that aggregation is appropriate.
The first consideration is whether the regulated intrastate activity is economic or commercial in nature. Id. at 611, 120 S.Ct. 1740. The question thus arises: what is the regulated activity that we must analyze? See GDF Realty Invs., Ltd. v. Norton, 326 F.3d 622, 633 (5th Cir. 2003). In GDF Realty, where we examined the “take” provision[22] of the ESA, we emphasized that we had to analyze the regulation of endangered species takes, not the commercial motivations of the plaintiff — developers who were challenging the statute. Id. at 636. Applying GDF Realty here, the regulated activity in question is the designation of Unit 1 as critical habitat, not the Landowners’ long-term development plans.
The next issue is whether the designation of Unit 1 as critical habitat is economic or commercial in nature. “[W]hether an activity is economic or commercial is to be given a broad reading in this context.” Id. at 638. In certain cases, an intrastate activity may have a direct relationship to commerce and therefore the intrastate activity alone may substantially affect interstate commerce. Alternatively, “the regulation can reach intrastate commercial activity that by itself is too trivial to have a substantial effect on interstate commerce but which, when aggregated with similar and related activity, can substantially affect interstate commerce.” United States v. Ho, 311 F.3d 589, 599 (5th Cir. 2002).
The designation of Unit 1 alone may not have a direct relationship to commerce, but under the aggregation principle, the designation of Unit 1 survives constitutional muster. Under this principle, the intrastate activity can be regulated if it is “an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.” Gonzales v. Raich, 545 U.S. 1, 36, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (quoting Lopez, 514 U.S. at 561, 115 S.Ct. 1624). Thus, there are two factors we must consider: (1) whether the provision mandating the designation of critical habitat is part of am economic regulatory scheme, and (2) whether designation is essential to that scheme.
We have already concluded that the ESA is an economic regulatory scheme. See GDF Realty, 326 F.3d at 639 (“ESA’s protection of endangered species is economic in nature.”); id. at 640 (“ESA is an economic regulatory scheme .... ”). Congress enacted the ESA to curb species extinction “as a consequence of economic growth and development untempered by adequate concern and conservation.” 16 U.S.C. § 1531(a)(1). Because the ESA’s drafters sought to protect the “incalculable” value of biodiversity, the ESA prohib *477 its interstate and foreign commerce in endangered species. See id. § 1538(a)(1)(E)-(F); GDF Realty, 326 F.3d at 639 (citation omitted). Finally, habitat protection and management — which often intersect with commercial development — underscore the economic nature of the ESA and its critical-habitat provision. See 16 U.S.C. § 1533(f)(1)(A) (requiring that the Secretary prioritize implementing recovery plans for “those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity”); see also id. § 1533(a)(1)(B) (listing the “overutilization [of a species] for commercial ... purposes” as one of the factors endangering or threatening species).
But it is not sufficient that the ESA is an economic regulatory scheme. The critical-habitat provision must also be an essential component of the ESA. If the process of designating critical habitat.is “an essential part of a larger regulation of economic activity,” then whether that process — designation—“ensnares some purely intrastate activity is of no moment.” Raich, 545 U.S. at 22, 125 S.Ct. 2195. “[T]he de minimis character of individual instances arising under that statute is of no consequence.” Id. at 17, 125 S.Ct. 2195 (citations and internal quotation marks omitted). When Congress has regulated a class of activities, we “have no power to excise, as trivial, individual instances of the class.” Id. at 23, 125 S.Ct. 2195 (citation and internal quotation marks omitted). We conclude that designating critical habitat is an essential part of the ESA’s economic regulatory scheme.
This conclusion is consistent with our analysis of the ESA’s “take” provision in GDF Realty. There, we held that “takes” of an endangered species that lived only in Texas could be aggregated with takes of other endangered species nationwide to survive a Commerce Clause challenge. GDF Realty, 326 F.3d at 640-41. That case concerned the Service’s regulation of takes of six subterranean endangered species (“the Cave Species”) located solely in two counties in Texas. Id. at 625. Similar to the Landowners here, the owners of some of the land under which these species lived wanted to develop the land into a commercial and residential area; they sued the government, claiming that the take provision of the ESA, as applied to the Cave Species, exceeded the boundaries of the Commerce Clause. Id. at 624, 626. Addressing this claim, we upheld the take provision. We explained that, in the aggregate, takes of all endangered species have a substantial effect on interstate commerce. See id. at 638-40. Because of the “interdependence of [all] species,” we held that regulating the takes of the Cave Species was an essential part of the larger regulatory scheme of the ESA, in that, without this regulation, the regulatory scheme could be undercut by piecemeal extinctions. Id. at 639-40. Every other circuit court that has addressed similar challenges has also upheld the ESA as a valid exercise of Congress’s Commerce Clause power. See Gibbs v. Babbitt, 214 F.3d 483, 497-98 (4th Cir. 2000); San Luis & Delta-Mendota Water Auth. v. Salazar, 638 F.3d 1163, 1177 (9th Cir. 2011); Wyoming v. U.S. Dep’t of Interior, 442 F.3d 1262, 1264 (10th Cir. 2006) (per curiam), aff'g 360 F.Supp.2d 1214, 1240 (D. Wyo. 2005); Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1274 (11th Cir. 2007); Rancho Viejo, LLC v. Norton, 323 F.3d 1062, 1080 (D.C. Cir. 2003); Nat’l Ass’n of Home Builders v. Babbitt, 130 F.3d 1041, 1049-57 (D.C. Cir. 1997). The Landowners have not identified any federal court of appeals that has held otherwise.
This caselaw compels the same conclusion here. For one, we see no basis to distinguish the ESA’s prohibition on *478 “takes” from the ESA’s mandate to designate critical habitat. As Congress recognized, one of the primary factors causing a species to become endangered is “the present or threatened destruction, modification, or curtailment of its habitat or range.” 16 U.S.C. § 1533(a)(1)(A). Because of the link between species survival and habitat preservation, the statute imposes a mandatory duty on the Service to designate critical habitat for endangered species “to the maximum extent prudent and determinable.” Id. § 1533(a)(3)(A). Indeed, the ESA includes an express purpose of conserving “the ecosystems upon which endangered species ... depend.” Id. § 1531(b); see also GDF Realty, 326 F.3d at 640 (“In fact, according to Congress, the ‘essential purpose’ of the ESA is ‘to protect the ecosystems upon which we and other species depend.’ ” (quoting H.R. Rep. No. 93-412, at 10)). Allowing a particular critical habitat — one that the Service has already found to be essential for the conservation of the species — to escape designation would undercut the ESA’s scheme by leading to piecemeal destruction of critical habitat. We therefore conclude that the critical-habitat provision is an essential part of the ESA, without which the ESA’s regulatory scheme would be undercut. Cf Ala.~Tombigbee Rivers Coal., 477 F.3d at 1274 (holding that “the ‘comprehensive scheme’ of species protection contained in the Endangered Species Act has a substantial effect on interstate commerce” and that the process of listing species as endangered or threatened is “an essential part of that larger regulation of economic activity” (citation and internal quotation marks omitted)).
Given this conclusion, the designation of Unit 1 may be aggregated with all other critical-habitat designations. As Judge Feldman correctly observed, “[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.” Markle Interests, 40 F.Supp.3d at 759 (alteration in original) (quoting Raich, 545 U.S. at 23, 125 S.Ct. 2195) (internal quotation marks omitted). “[W]hen a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.” Raich, 545 U.S. at 17, 125 S.Ct. 2195 (citations and internal quotation marks omitted). We therefore will not look at the designation of Unit 1 in isolation, but instead we consider it aggregated with all other critical-habitat designations. Judge Feldman reached the same conclusion, explaining that, “[aggregating the regulation of activities that adversely modify the frog’s critical habitat” — including the isolated designation of Unit 1 — “with the regulation of activities that affect other listed species’ habitat, the designation of critical habitat by the [Service] is a constitutionally .valid application of a constitutionally valid Commerce Clause regulatory scheme.” Markle Interests, 40 F.Supp.3d at 759. Because the Landowners concede that the critical-habitat provision of the ESA is a valid exercise of Congress’s Commerce Clause authority, we can likewise conclude that the application of the ESA’s critical-habitat provision to Unit 1 is a constitutional exercise of the Commerce Clause power.[23]
*479 III. National Environmental Policy Act
Finally, the Landowners contend that the Service violated NEPA by failing to prepare an environmental impact statement before designating Unit 1 as critical habitat. If proposed federal action will “significantly affect[] the quality of the human environment,” NEPA requires the relevant federal agency to provide an environmental impact statement for the proposed action. 42 U.S.C. § 4332(2)(C). In Sabine River Authority, we explained that an environmental impact statement “is not required for non major action or a major action which does not have significant impact on the environment.” 951 F.2d at 677 (citation and internal quotation marks omitted). This standard necessarily means that if federal action will not result in any change to the environment, then the action does not trigger NEPA’s impact-statement requirement. See id. at 679 (noting that federal action “did not effectuate any change to the environment which would otherwise trigger the need to prepare an [environmental impact statement]”); see also Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 774, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983) (explaining that no environmental impact statement is required if health damage stemming from federal action “would not be proximately related to a change in the physical environment”); City of Dallas, Tex. v. Hall, 562 F.3d 712, 723 (5th Cir. 2009) (holding that an environmental impact statement was not required when the federal action “[did] not effect a change in the use or character of land or in the physical environment”).
Judge Feldman correctly held that the designation of Unit 1 does not trigger *480 NEPA’s impact-statement requirement because the designation “does not effect changes to the physical environment.” Markle Interests, 40 F.Supp.3d at 768. The designation also does not require the Landowners to take action as a result of the designation. As Judge Feldman correctly observed, “the ESA statutory scheme makes clear that [the Service] has no authority to force private landowners to maintain or improve the habitat existing on their land.” Id. (footnote and citation omitted). We agree that the Service was not required to complete an environmental impact statement before designating Unit 1 as critical habitat for the dusky gopher frog.
Alternatively, this claim is resolved on the threshold issue of the Landowners’ standing to raise this NEPA claim. A plaintiff bringing a claim under NEPA must not only have Article III standing to pursue the claim, but also fall within the zone of interests sought to be protected under the statute. See Lujan v. Nat’l Wildlife Fed’n, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); Sabine River Auth., 951 F.2d at 675 (recognizing that the zone-of-interests test applies to challenges under NEPA). Other circuit courts have held that “a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA.” Nev. Land Action Ass’n v. U.S. Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993) (citing cases from the Fourth, Eighth, Ninth, and D.C. Circuits). Consistent with this conclusion, we have observed in dicta that a “disappointed contractor” who was injured by an easement that prevented development opportunities would not have standing under the zone-of-interests test because “NEPA was not designed to protect contractors’ rights: it was designed to protect the environment.” Sabine River Auth., 951 F.2d at 676. The Landowners’ asserted injuries here are similarly economic, not environmental: lost future development and lost property value. These economic injuries do not fall within the zone of interests protected by NEPA, and the Landowners therefore lack standing to sue to enforce NEPA’s impact-statement requirement.
CONCLUSION
For the reasons stated above, we AFFIRM the judgment of the district court.

. See Designation of Critical Habitat for Mississippi Gopher Frog, 76 Fed. Reg. 59,774, 59,775 (proposed Sept. 27, 2011) (to be codified at 50 C.F.R. pt. 17) [hereinafter Revised Proposal], The frog was previously known as the Mississippi gopher frog, but further taxonomic research indicated that the dusky gopher frog is different from other gopher frogs, warranting acceptance as its own species: the Rana sevosa or the dusky gopher frog. Id. We will refer to the frog as the dusky gopher frog.

. Designation of Critical Habitat for Dusky Gopher Frog (Previously Mississippi Gopher Frog), 77 Fed. Reg. 35,118, 35,129 (June 12, 2012) (to be codified at 50 C.F.R. pt. 17) [hereinafter Final Designation]. It appears that the frogs are not accustomed to human interaction. If you pick up a gopher frog and hold it, the frog will play dead and even cover its eyes; if you hold the frog long enough, it will peak at you and then pretend to be dead again.

.See Final Rule to List the Mississippi Gopher Frog Distinct Population Segment of Dusky Gopher Frog as Endangered, 66 Fed. Reg. 62,993, 62,993, 62,995, 63,000 (Dec. 4, 2001) (to be codified at 50 C.F.R. pt. 17) [hereinafter Final Rule].

. The Secretary of the Department of the Interior and the Secretary of the Department of Commerce are jointly charged with administering the ESA. See 16 U.S.C. § 1532(15). The Secretary of the Interior administers the ESA through the Fish and Wildlife Service. We refer to both the Secretary and the agency as the “Service.”

. See Designation of Critical Habitat for Mississippi Gopher Frog, 75 Fed. Reg. 31,387, 31,387 (proposed June 3, 2010) (to be codified at 50 C.F.R. pt. 17) [hereinafter Original Proposal],

.The Service typically is required to designate critical habitat at the same time that it lists a species as endangered or threatened. 16 U.S.C. § 1533(a)(3)(A)(i). But if critical habitat is not “determinable” at the time of listing, the Service can extend the deadline for making a critical-habitat designation. See id. § 1533(b)(6)(A)(ii), (b)(6)(C)(ii). Although the Service listed the dusky gopher frog as endangered in 2001, it declined to designate critical habitat at that time because of budget limitations. See Final Rule, 66 Fed. Reg. at 63,000. Six years later, in 2007, the Service still had not designated critical habitat for the frog. The Center for Biological Diversity therefore sued the Service for failing to timely designate critical habitat. That lawsuit resulted in a court-approved settlement agreement that set deadlines for the Service to designate critical habitat for the dusky gopher frog. The Service’s resulting designations under this agreement, including the designation of Unit 1, prompted the lawsuit that we are considering on appeal.

. Section 7 consultation is also required whenever any federal action will "jeopardize the continued existence” of an endangered species, regardless of whether the Service has designated critical habitat. 16 U.S.C. § 1536(a)(2); see Sierm Club, 245 F.3d at 439.

. If the Service determines that a contemplated action — the issuance of a permit, for example — is likely to adversely modify critical habitat, the Service must suggest "reasonable and prudent alternatives” that the consulting agency could take to avoid adverse modification. See 50 C.F.R. § 402.14(h)(3). These alternatives must be "economically and technologically feasible.” Id. § 402.02.

. This Article III standing analysis applies to all of the Landowners' claims, not just the Landowners' claim under the ESA.

. To the contrary, the record reflects that, at the time Unit 1 was designated, development plans had already been delayed because of the recession and the mortgage crisis. This uncertainty about development not only underscores the absence of a concrete injury, but also highlights that any injury, however speculative, is not fairly traceable to the critical-habitat designation. Moreover, the long-term timber lease running on the land until 2043 also suggests that development may not occur on Unit 1 in the foreseeable future. Although the Landowners suggest that they could renegotiate the timber lease as conditions change, they have not demonstrated that they have concrete plans to do so.

. We are mindful that the Supreme Court has recently clarified that " 'prudential standing' is a misnomer as applied to the zone-of-interests analysis/' emphasizing instead that the analysis requires "using traditional tools of statutory interpretation.” Lexmark Int'l, Inc. v. Static Control Components, Inc., - U.S.-, 134 S.Ct. 1377, 1387, 188 L.Ed.2d 392 (2014) (citation and internal quotation marks omitted).

. Under the regulations in place at the time of the critical-habitat designation at issue here, the Service referred to these "physical or biological features” as "primary constituent elements” or "PCEs.” 50 C.F.R. § 424.12(b) (2012). The primary constituent elements that make up the dusky gopher frog's habitat are (1) ephemeral ponds used for breeding, (2) upland, open-canopy forests "adjacent to and accessible to and from breeding ponds,” and (3) upland connectivity habitat to allow the frog to move between breeding and nonbreeding habitats. Final Designation, 77 Fed. Reg. at 35,131.

. Amici supporting the Landowners do challenge this finding, and the Landowners asserted at oral argument that they would contest this finding. The Landowners, however, did not challenge this finding in either of their briefs on appeal. We therefore will not consider it. See World Wide St. Preachers Fellowship v. Town of Columbia, 591 F.3d 747, 752 n. 3 (5th Cir. 2009) (“It is well-settled in this circuit that an amicus curiae generally cannot expand the scope of an appeal to implicate issues that have not been presented by the parties to the appeal.” (citation and internal quotation marks omitted)); see also Crane, 783 F.3d at 252 n. 34 (explaining that a party *466 waives an argument by failing to make it in the party’s opening brief).

. Amici do challenge the scope of the Unit 1 designation, but we will not consider this argument because the Landowners did not raise it on appeal. See World Wide St. Preachers Fellowship, 591 F.3d at 752 n. 3.

. The dissent instead introduces two alternative definitions of "essential” from Black’s Law Dictionary. “2. Of the utmost importance; basic and necessary. 3. Having real existence, actual.” Dissent at 483. The dissent then goes on to cite MCI Telecommunications Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994), for the proposition that "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear.” Dissent at 484. The dissent's own alternative definitions distinguish MCI from this case. In MCI, the agency advanced an interpretation of the word "modify” that flatly contradicted the definition provided by "[v]irtually every dictionary [the Court] was aware of.” Id. at 225, 114 S.Ct. 2223. Here, in contrast, one of the dissent’s own definitions of essential — "of the utmost importance; basic and necessary” — describes well a close system of ephemeral ponds, per the scientific consensus that the Service relied upon. See infra.

. We further note that it was logical for Congress to require the Service to estimate a timeline for achieving its conservation goals in a recovery plan but not to impose that requirement for critical-habitat designations because there is no deadline for creating a recovery plan, but there is a one-year deadline for designating critical habitat. See 16 U.S.C. § 1533(b)(6)(A)(ii), (b)(6)(C)(ii); see also Home Builders Ass’n of N. Cal., 616 F.3d at 990.

. The statute requires the Service to base its decision on "the best scientific data available.” 16 U.S.C. § 1533(b)(2). Here, the Service followed that command and made an objective feasibility determination that the uplands surrounding the ephemeral ponds, although currently lacking "the essential physical or biological features of critical habitat,” are “restorable with reasonable effort.” Final Designation, 77 Fed. Reg. at 35,135. We find no basis in the text of the statute for the "reasonable probability” test introduced by the dissent, which looks to "many factors" including "whether a reasonable landowner would be likely to undertake the necessary modifications.” Dissent at 487. Although a "reasonable landowner” test has the sound of an objective test, the dissent does not make clear how such a test would be applied in practice, nor how it would avoid taking into account the subjective intentions of specific landowners. For example, the dissent says that in a scenario in which a “landowner ... enter[s] into an agreement to modify land so that it might be used as habitat, there would be nothing 'subjective' in concluding that it is reasonably probable that the land will actually be used at habitat." Dissent at 487. A test that can come out differently depending on the actual plans of specific landowners is, by definition, subjective.

. Nor do we see how the Service could justify designating land that objectively — that is, for scientific reasons — could never contribute to the conservation of a species — say, for example, if the ephemeral ponds were located within a toxic spill zone that scientists concluded could not be remediated. Where we differ critically from the dissent is on the question whether the ESA provides any basis for taking into account subjective third-party intentions when determining whether land could contribute to the conservation of a species. We hold that it does not. Under our approach, it would still be arbitrary and capricious for the Service to label as essential land that is objectively impossible to use for conservation. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (finding the National Highway Traffic Safety Administration's rescission of a rule requiring passive restraints in automobiles arbitrary and capricious because the agency did not provide a "rational connection between the facts found and the choice made”); see also Arizona Cattle Growers’ Ass’n v. U.S. Fish & Wildlife, Bureau of Land Mgmt., 273 F.3d 1229, 1243-44 (9th Cir. 2001) (finding the Fish and Wildlife Service's issuance of an incidental-take statement arbitrary and capricious because the evidence linking cattle grazing to an effect on the razorback sucker was too speculative and "woefully insufficient”); Chem. Mfrs. Ass’n v. E.P.A., 28 F.3d 1259, 1265-66 (D.C. Cir. 1994) (finding the Environmental Protection Agency’s final rule designating a pollutant as high risk arbitrary and capricious because "there [was] simply no rational relationship between the model [used in making the determination] and the known behavior of the hazardous air pollutant to which it [was] applied”).

. We fail to see how the Service would be able to similarly justify as rational an essen- ■ tiality finding as to arbitrarily chosen land. In contrast, the dissent, similar to the Landowners, contends that "[i]t is easily conceivable that ‘the best scientific data available’ would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species.” Dissent at 488. Even assuming that to be true, it does not follow that scientists or the Service would or could then reasonably call an empty field essential for the conservation of a species. If the field in question were no different than any other empty field, what would make it essential? Presumably, if the field could be modified into suitable habitat, so could any of the one hundred or one thousand other similar fields. If the fields are fungible, it would be arbitrary for the Service to label any single one "essential” to the *472 conservation of a species. It is only by overlooking this point that the dissent can maintain that our approval of the Service's reading of “essential" will “mean[ ] that virtually any part of the United States could be designated as 'critical habitat' for any given endangered species so long as the property could be modified in a way that would support introduction and subsequent conservation of the species on it.” Dissent at 483 (emphasis added).

. The dissent also takes aim at our acceptance of the Service's scientifically grounded essentiality finding in this case, contending that, under our decision, the Service can designate any land as critical habitat whenever it contains a single one of the "physical or biological features” essential to the conservation of the species at issue. 16 U.S.C. § 1532(5)(A)(i). Dissent at 488-89. We create no such generalized rule. We hold only that in this case, substantial, consensus, scientific evidence in the record supports the Service's conclusion that the ephemeral ponds present on Unit 1 are essential for the conservation of the dusky gopher frog. See, e.g., Final Designation, 77 Fed. Reg. at 35123 (summarizing the scientific consensus that the rarity of isolated, ephemeral ponds "is a limiting factor in dusky gopher frog recovery”). The ponds cannot be separated from the land that contains them. Thus, if the ponds are essential, then Unit 1, which contains the ponds, is essential for the conservation of the dusky gopher frog. In general, the dissent seeks to decouple the Service's “essentiality” finding from its scientific determination process, turning it into a purely legal standard. We decline to do so, with the good reason that the ESA specifically requires that critical habitat determinations be based on "scientific data.” See 16 U.S.C. § 1533(b)(2).

. In response to the dissent's policy concerns about ever-expanding designations, we also note that the ESA limits critical-habitat designations on the back end as well, because successful conservation through critical-habitat designation ultimately works towards un-designation. See, e.g., Removal of the Louisiana Black Bear From the Federal List of Endangered and Threatened Wildlife and Removal of Similarity-of-Appearance Protections for the American Black Bear, 81 Fed. Reg. 13,124, 13,171 (March 11, 2016) (to be codified at 50 C.F.R. pt. 17) (final rule removing Louisiana black bear from endangered species list and, accordingly, "removing the designated critical habitat for the Louisiana black bear”).

. See 16 U.S.C. § 1532(19) (“The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.”); id. § 1538(a)(1)(B) (making it unlawful to “take” an endangered species).

. Although the Landowners' concession truncates our analysis, we observe that the other three considerations articulated in Morrison also weigh in favor of concluding that the critical-habitat provision of the ESA is constitutional as applied to the dusky gopher frog. Although there is no jurisdictional element in the statute limiting its application to instances affecting interstate commerce, the "interdependence of species” underscores that critical-habitat designations affect interstate commerce. GDF Realty, 326 F.3d at 640. *479 In this sense, the ESA's critical-habitat provision "is limited to instances which 'have an explicit connection with or effect on interstate commerce.’ ” Id. (quoting Morrison, 529 U.S. at 611-12, 120 S.Ct. 1740).
Next, the congressional findings, legislative history, and statutory provisions indicate that the regulated activity has an effect on interstate commerce. See 16 U.S.C. § 1531(a)(1) ("The Congress finds and declares that ... various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation ....”); id. § 1533(a)(l)(A)-(B) (acknowledging "the present or threatened destruction, modification, or curtailment of [a species’s] habitat or its range” and the “overutilization [of species] for commercial ... purposes” as factors leading to species endangerment); Tenn. Valley Auth., 437 U.S. at 177-78, 98 S.Ct. 2279 (summarizing the legislative history of the ESA); Gibbs, 214 F.3d at 495 (discussing the legislative history of the ESA and the possibility of renewing a commercial market in a species once it is no longer endangered or threatened (citing S. Rep. No. 91-526, at 3 (1969))); see also San Luis & Delta-Mendota "Water Auth., 638 F.3d at 1176.
Finally, the link between critical-habitat designation and its effect on interstate commerce is not too attenuated. The ESA is economic in nature, and Congress has made critical-habitat designation a mandatory component of the regime. See 16 U.S.C. § 1533(a)(3)(A)(i) (stating that the Service "shall ... designate any habitat of [an endangered] species which is then considered to be critical habitat” (emphasis added)). Moreover, as this case highlights, any future regulation of Unit 1 or other critical habitat would occur if the Landowners' commercial development plans triggered Section 7 consultation. Thus, the link to interstate commerce is not too attenuated for purposes of Commerce Clause analysis. See Morrison, 529 U.S. at 611, 120 S.Ct. 1740 (explaining that the statutes challenged in Lopez and Morrison fell outside Congress's Commerce Clause authority because "neither the actors nor their conduct ha[d] a commercial character, and neither the purposes nor the design of the statute ha[d] an evident commercial nexus” (citation and internal quotation marks omitted)). For these additional reasons, the application of the ESA’s critical-habitat provision is constitutional as applied to the dusky gopher frog.