# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

No. 14-31008
_____

MARKLE INTERESTS, L.L.C.; P&F LUMBER COMPANY 2000, L.L.C.; PF MONROE PROPERTIES, L.L.C.,

        Plaintiffs - Appellants

v.

UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL M. ASHE, Director of United States Fish & Wildlife Service, in his official capacity; UNITED STATES DEPARTMENT OF INTERIOR; SALLY JEWELL, in her official capacity as Secretary of the Department of Interior,

        Defendants - Appellees

CENTER FOR BIOLOGICAL DIVERSITY; GULF RESTORATION NETWORK,

        Intervenor Defendants - Appellees

_____

Cons. w/ 14-31021
WEYERHAEUSER COMPANY,

        Plaintiff - Appellant

v.

UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL M. ASHE, Director of United States Fish & Wildlife Service, in his official capacity; SALLY JEWELL, in her official capacity as Secretary of the Department of Interior,

        Defendants - Appellees

No. 14-31008
Cons. w/ No. 14-31021

CENTER FOR BIOLOGICAL DIVERSITY; GULF RESTORATION NETWORK,

      Intervenor Defendants - Appellees

_____

Appeals from the United States District Court for the
Eastern District of Louisiana, New Orleans
_____

ON PETITION FOR REHEARING EN BANC

(Opinion June 30, 2016, 827 F.3d 452)


Before REAVLEY, OWEN, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

The court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED. In the en banc poll, six judges voted in favor of rehearing (Judges Jolly, Jones, Smith, Clement, Owen, and Elrod) and eight judges voted against rehearing (Chief Judge Stewart and Judges Dennis, Prado, Southwick, Haynes, Graves, Higginson, and Costa). Judge Jones, joined by Judges Jolly, Smith, Clement, Owen, and Elrod, dissents from the court's denial of rehearing en banc, and her dissent is attached.

ENTERED FOR THE COURT:

_____
UNITED STATES CIRCUIT JUDGE


2

JONES, Circuit Judge, joined by JOLLY, SMITH, CLEMENT, OWEN, and ELROD, Circuit Judges, dissenting from Denial of Rehearing En Banc:

The protagonist in this Endangered Species Act (ESA) case—the dusky gopher frog—is rumored to "play dead," "cover its eyes," "peak [sic] at you[,]" and then pretend to be dead again." *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 458 n.2 (5th Cir. 2016). The panel majority regrettably followed the same strategy in judicial review—play dead, cover their eyes, peek, and play dead again. Even more regrettably, the court refused to rehear this decision en banc. I respectfully dissent.

The panel opinion, over Judge Owen's cogent dissent, *id.* at 480–94, approved an unauthorized extension of ESA restrictions to a 1,500 acre-plus Louisiana land tract that is neither occupied by nor suitable for occupation by nor connected in any way to the "shy frog." The frogs currently live upon or can inhabit eleven other uncontested critical habitat tracts in Mississippi. No conservation benefits accrue to them, but this designation costs the Louisiana landowners $34 million in future development opportunities. Properly construed, the ESA does not authorize this wholly unprecedented regulatory action.

The panel majority upheld the designation of the tract as "unoccupied critical habitat." *See* 16 U.S.C. § 1532(5)(A)(ii). Relying on administrative deference, the majority reasoned that (1) the ESA and its implementing regulations have no "habitability requirement"; (2) the (unoccupied) Louisiana land is "essential for the conservation of" the frog even though it contains just one of three features critical to dusky gopher frog habitat; and (3) the Fish and Wildlife Service's decision not to exclude this tract from critical-habitat designation is discretionary and thus not judicially reviewable. I respectfully submit that all of these conclusions are wrong.

3

Each issue turns essentially on statutory construction, not on deference to administrative discretion or scientific factfinding. The panel majority opinion obscures the necessity for careful statutory exposition. More troublingly, the majority opinion fails to distinguish relevant precedent that recognized Congress's prescribed limit to designations of unoccupied critical habitat. Further, in declaring the decision not to exclude this tract as beyond judicial review, the panel did not notice *Bennett v. Spear,* 520 U.S. 154, 117 S. Ct. 1154 (1997), which upholds judicial review for this exact statute, and the panel majority ignored recent Supreme Court precedents that have reined in attempts to prevent judicial review of agency action.

Despite the majority's disclaimers and attempt to cabin their rationale, the ramifications of this decision for national land use regulation and for judicial review of agency action cannot be underestimated. Fifteen states appear as *amici* urging rehearing en banc. For reasons explained herewith and by Judge Owen's dissent, I would have granted rehearing en banc.

## I. Background

The U.S. Fish and Wildlife Service (the Service) is one of two agencies tasked with implementing the ESA. The ESA requires the identification and listing of endangered and threatened species. When a particular species is listed, the Service must designate the species' "critical habitat." In particular, the Service

> to the maximum extent prudent and determinable . . . shall . . . designate any habitat of such species which is then considered to be critical habitat . . . and . . . may, from time-to-time thereafter as appropriate, revise such designation.

16 U.S.C. § 1533(a)(3)(A)(i)–(ii).

"Critical habitat" is defined in an earlier provision as:

> (i)  the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the

4

provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; ["occupied critical habitat"] and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species. ["unoccupied critical habitat"]

*Id.* § 1532(5)(A)(i)–(ii).

Finally, the Service shall designate critical habitat "after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat," but it may exclude any area from such designation if "the benefits of such exclusion outweigh the benefits of specifying such area" as critical habitat. *Id.* § 1533(b)(2).

Critical-habitat designation is consequential. "Designation of private property as critical habitat can impose significant costs on landowners because federal agencies may not authorize, fund, or carry out actions that are likely to 'result in the destruction or adverse modification' of critical habitat." *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 915 (D.C. Cir. 2011) (quoting 16 U.S.C. § 1536(a)(2)).

The Service listed the dusky gopher frog as endangered in 2001. Final Rule to List the Mississippi Gopher Frog Distinct Population Segment of Dusky Gopher Frog As Endangered, 66 Fed. Reg. 62,993 (Dec. 4, 2001). Goaded by a lawsuit, and after notice and comment, the Service published a final rule designating critical habitat in 2012. Designation of Critical Habitat for Dusky Gopher Frog, 77 Fed. Reg. 35,118 (June 12, 2012) [hereinafter Final Designation]. The critical-habitat designation included units spanning several

5

thousand acres in Mississippi, and, as relevant here, Unit 1—consisting of 1,544 acres in Louisiana, which are not occupied by the dusky gopher frog. *Id.* The Service was thus required to show that Unit 1—the "specific area"—is "essential for the conservation of the [dusky gopher frog]." 16 U.S.C. § 1532(5)(A)(ii).

Unlike all of the Mississippi units, Unit 1 is uninhabitable by the shy frog. Final Designation, 77 Fed. Reg. at 35,131. Unit 1, in fact, contains only one of the three "physical and biological features" deemed necessary to dusky gopher frog habitat—five ephemeral ponds that could support the frog's reproduction. *Id.* at 35,123, 35,132. Worse still, "[a]pproximately ninety percent of [Unit 1] is currently covered with closed canopy loblolly pine plantations," and the two remaining features essential for the frog's conservation require an *open*-canopied longleaf pine ecosystem. *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 482 (5th Cir. 2016) (Owen, J., dissenting); Final Designation, 77 Fed. Reg. at 35,131. In the Service's own words, "the surrounding uplands are poor-quality terrestrial habitat for dusky gopher frogs." Final Designation, 77 Fed. Reg. at 35,133. The Service admitted that without "prescribed burning" and creating a "forested habitat (preferably longleaf pine)," among other measures, Unit 1 is "unsuitable as habitat for dusky gopher frogs." *Id.* at 35,129, 35,132.

Designating Unit 1 as critical habitat also portends significant economic losses to the landowners in Unit 1. The Service acknowledged that critical-habitat designation could result in economic impacts of up to $34 million, stemming from lost development opportunities. *Id.* at 35,140.

Despite Unit 1's flaws, however, the Service asserted that "the presence of the PCEs [the physical and biological features essential for the frog's conservation] is not a necessary element in [the unoccupied critical habitat]

determination." *Id.* at 35,123. The Service expressed its "hope to work with the landowners to develop a strategy that will allow them to achieve their objectives for the property and protect the isolated, ephemeral ponds that exist there." *Id.* But of course, the Service's preferred "tools and programs are voluntary, and actions such as habitat management through prescribed burning, or frog translocations to the site, cannot be implemented without the cooperation and permission of the landowner." *Id.* In addition, the Service stated that its "economic analysis did not identify any disproportionate costs that are likely to result from the designation." *Id.* at 35,141. Therefore, the Service included Unit 1 as unoccupied critical habitat.

The appellants in this case are landowners of Unit 1 involved in timber operations and commercial development. Their suit alleges that because Unit 1 is uninhabitable by the dusky gopher frog, it is not "essential for the conservation of" the frog as required for unoccupied critical habitat. They also allege that the Service never compared the costs and benefits of designating Unit 1 as critical habitat to support its conclusion that designation would cause no "disproportionate" impacts. The district court granted summary judgment in the Service's favor.

The panel majority affirmed the district court. The panel majority first rejected any notion that the ESA requires critical habitat to be habitable, characterizing such a requirement as an "extra-textual limit." *Markle Interests*, 827 F.3d at 468 (majority opinion). Second, turning to whether Unit 1 met the definition of unoccupied critical habitat, the panel majority held that "a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature—the ephemeral ponds—. . . justified [the Service's] finding that Unit 1 was essential for the conservation of the dusky gopher frog." *Id.* at 471. According to the panel majority, "if the ponds are essential, then

Unit 1, which contains the ponds, is essential for the conservation of the dusky gopher frog."[1]  *Id.* at 472 n.20.  Finally, the panel majority held that the Service's decision not to exclude Unit 1 from critical habitat on the basis of economic impact was unreviewable because that decision is committed to the Service's discretion.  *Id.* at 473–75.  All three holdings are incorrect.

## II.  Contrary to the Panel Majority's Holding, the ESA Contains a Clear Habitability Requirement

No one disputes that the dusky gopher frog cannot inhabit Unit 1.  The panel majority find that fact irrelevant, however, because looking only at the statute's definitional section, the ESA does not appear to require that a species actually be able to inhabit its "unoccupied critical habitat."  They dismiss habitability as an "extra-textual limit" that cannot be found in either "the text of the ESA or the implementing regulations."  *Markle Interests*, 827 F.3d at 468 (majority opinion).  Read in context, however, the ESA makes clear that a species' critical habitat must be a subset of that species' habitat.  The ESA's implementing regulations are consistent with this subset arrangement.  Further, when Congress got around to clarifying critical-habitat regulation in 1978, the contemporary understanding of critical habitat, shared alike by the most fervent proponents and opponents of wildlife and habitat protection, was that it meant a part of the species' actual habitat.

Unfortunately, the parties here failed to undertake holistic statutory interpretation.  Misled by the parties' briefing, the panel also neglected this effort.  Another difficulty is the Ninth Circuit's adoption of a similar, non-

---

[1] On this issue, Judge Owen dissented, arguing that the panel majority opinion "re-writes the Endangered Species Act" because "[n]either the words 'a critical feature' nor such a concept appear in the Act."  *Id.* at 488 (Owen, J., dissenting).  "The touchstone chosen by Congress was 'essential,'" and "[t]he existence of a single, even if rare, physical characteristic does not render an area 'essential' when the area cannot support the species because of the lack of other necessary physical characteristics."  *Id.*

habitat interpretation of "unoccupied critical habitat." *See Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 993–94 (9th Cir. 2015). Nevertheless, given the significance of this case and the fact that the law is clear beyond dispute, it was our court's duty to "state what the law is."

## A. A Species' Critical Habitat Must Be a Subset of the Species' Habitat

The ESA states that the Service

*shall*, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, *designate any habitat of such species which is then considered to be critical habitat* . . . and . . . may, from time-to-time thereafter as appropriate, revise such designation.

16 U.S.C. § 1533(a)(3)(A)(i)–(ii) (emphases added). Whatever is "critical habitat," according to this operative provision, must first be "any habitat of such species." The fact that the statutory definition of "critical habitat," on which the entirety of the panel opinion relies, includes areas within and without those presently "occupied" by the species does not alter the larger fact that all such areas must be within the "habitat of such species."

This is not the only time Congress drew this distinction. For example, the ESA requires federal agencies to consult with the Service to ensure that their activities are "not likely" to result in various adverse impacts on listed species and their critical habitats. *See id.* § 1536(a)(2). Such consultation is required, *inter alia*, where agency activities would be likely to "result in the destruction or adverse modification of *habitat of such [endangered or threatened] species which is determined by the Secretary*, after consultation as appropriate with affected States, *to be critical*[.]" *Id.* (emphases added). There, too, Congress separated out the "critical" portion of the habitat from the general "habitat of such species." In other provisions, Congress reiterated its focus on species' habitats. *See, e.g., id.* § 1533(a)(1)(A) (listing "curtailment of

[a species'] habitat" as a factor in determining whether the species is endangered or threatened); *id.* § 1537(b)(3) (requiring the Service to encourage foreign persons to develop and carry out "conservation practices designed to enhance such fish or wildlife or plants and their habitat"); *id.* § 1537a(e)(2)(B) (requiring the Service to cooperate with foreign nations in "identification of those species of birds that migrate between the United States and other contracting parties, and the habitats upon which those species depend").

The ESA's implementing regulations also distinguish between the designations of "critical habitat" and "habitat."[2] For instance, section 402 begins by explaining its "scope" in terms of critical habitat: it "interprets and implements" section 7 of the ESA, which "imposes requirements upon Federal agencies regarding endangered or threatened species . . . and habitat of such species that has been designated as critical ('critical habitat')." 50 C.F.R. § 402.01(a). Section 402.01 goes on to list what measures are required to guard against "the destruction or adverse modification of ['habitat of such species that has been designated as critical']." *Id.* The consistent focus on species' "habitat" demonstrates, by its use in these passages, that it is a broader concept than "critical habitat." *See, e.g., id.* § 402.02 (referring to "actions intended to conserve listed species or their habitat"); *id.* § 402.05(b) (in the context of emergency consultation, referring to "impacts to endangered or threatened species and their habitats").

The bottom line is that the ESA's text and implementing regulations unequivocally establish that only "habitat of such species" may be designated

---

[2] Other regulations reflecting on the consultation provisions make the distinction as well. *See, e.g.*, 32 C.F.R. § 643.32 (emphasizing the ESA requires agencies to ensure that their actions are not likely to result in the destruction or modification of "habitat of such species which is determined . . . to be critical"); 7 C.F.R. § 650.22(a)(3) (same); 33 C.F.R. § 320.3(i) (same).

as critical habitat. Thus, for example, if white-tailed deer were listed as an endangered species, their habitat would include, at a minimum, virtually all of Texas, but their "critical habitat" would be limited to those portions of their habitat that meet the definition of "critical habitat."

The Service's first task is accordingly to determine whether the land under consideration for critical-habitat designation is "habitat of such species." "Habitat" is defined as "the place where a plant or animal species naturally lives and grows." Webster's Third New International Dictionary 1017 (1961). *See also* The Random House Dictionary of the English Language 634 (1969) ("[T]he kind of place that is natural for the life and growth of an animal or plant[.]"); *Habitat*, *Black's Law Dictionary* (10th ed. 2014) ("The place where a particular species of animal or plant is normally found."). The question thus becomes whether the land under consideration for critical-habitat designation is where the species at issue naturally lives and grows or would naturally live and grow. Only after the Service has answered that question affirmatively can it assess whether the species' habitat meets the statutory definition of "*critical habitat*."

### B. The Evolution of the ESA Confirms that Limiting a Species' Critical Habitat to the Species' Habitat Was Intentional

Congress's limitation of critical-habitat designations to the "habitat of such species" was no accident. This limitation can be traced back to the original text of the ESA, which in 1973 contained only two sentences on section 7 consultation, one of which briefly mentioned critical habitat:

> *All other Federal departments and agencies shall*, in consultation with and with the assistance of the Secretary, *utilize their authorities* in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act and *by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued*

11

*existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical.*

Endangered Species Act of 1973, Pub. L. No. 93-205, § 7, 87 Stat. 884, 892 (1973) (emphases added). This predecessor provision, like the current consultation requirements, refers to the destruction or modification of "habitat of such species which is determined by the Secretary . . . to be critical."[3] From the very beginning, Congress rooted the concept of critical habitat in the relevant species' actual habitat.

Controversial decisions including *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), prompted Congress in 1978 to revisit the definition of critical habitat and the role of consultation.[4] As relevant here, Congress amended section 1533 to require the Service at the time of listing an

---

[3] Preservation of species' habitat was an early goal of various interest groups. *See, e.g.*, *Endangered Species: Hearings on H.R. 37, H.R. 470, H.R. 471, H.R. 1461, H.R. 1511, H.R. 2669, H.R. 2735, H.R. 3310, H.R. 3696, H.R. 3795, H.R. 4755, H.R. 2169, and H.R. 4758 Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the H. Comm. on Merchant Marine and Fisheries*, 93d Cong. 241 (1973) (statement of A. Gene Gazlay, Director, Michigan Department of Natural Resources: "[Proposed legislation] should affirm the well-known fact that while legal protection and law enforcement are needed, the maintenance of suitable habitat is vital to the restoration of threatened wildlife."); *id.* at 258 (statement of Society for Animal Protective Legislation: "Rare and endangered animals should be protected in their natural habitat to the greatest extent possible."); *id.* at 271 (statement of Howard S. Irwin, President, New York Botanical Garden: "[T]he most serious aspect of the preservation of endangered species of plants is the preservation of their habitats."); *id.* at 299, 301 (statement of Tom Garrett, Wildlife Director, Friends of the Earth: "It should be obvious to any of us that if we do not preserve the habitat of species, and the integrity of biotic communities, whether or not plants or animals are protected from deliberate molestation becomes, eventually, academic. . . . I would like to emphasize again that it is ultimately immaterial whether or not an animal is deliberately molested if its habitat is not preserved."); *id.* at 326 (statement of Milt Stenlund, Supervisor of Game, Minnesota Department of Natural Resources: "[M]ore importance should be placed on the habitat of the endangered species. . . . While we may be concerned about the animal and greatly concerned about man's effect on the animal, I am convinced that we should be more concerned about the country, the habitat, in which the wolf lives. . . . In any endangered species program, I would like the committee to consider the fact that the habitat in which the endangered species live could be far more important than protection of the animal itself.").

[4] Our research on the committee hearings, floor debates, and congressional reports leading up to the 1978 amendments indicates uniform awareness in Congress that a species' critical habitat was a subset of the species' habitat.

endangered or threatened species to "specify any habitat of such species which is then considered to be critical habitat." Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, § 11, 92 Stat. 3751, 3764 (1978). Congress's reference to the "habitat of such species" as a prerequisite to a (usually) narrower critical-habitat designation was, in fact, not new at all. It had been in the ESA since its inception and had become widely accepted as a bedrock principle. That principle—plain from both text and history—is that the Service may only designate a species' habitat as critical habitat.

Further, this distinction is embodied in the operative provision, which tells the Service what to do: it "*shall*, concurrently with [determining to list a species as endangered or threatened], *designate any habitat of such species which is then considered to be critical habitat*[.]" 16 U.S.C. § 1533(a)(3)(A)(i) (emphases added). The *definition* of critical habitat, in contrast, pertains only to one term in this provision. Critical habitat is not necessarily *all* habitat, but its irreducible minimum is that it *be habitat*. A diagram explains this statutory plan:



*Figure 1: Under the ESA, a species' critical habitat is necessarily a subset of the species' habitat.*

13

**C. By Holding that "Critical Habitat" Has No Habitability Requirement, the Panel Majority Contradict the ESA's Plain Language**

What went awry with the panel majority opinion? The majority overlook section 1533(a)(3)(A)(i) completely. This unfortunate oversight was no doubt abetted by the facts that the Service's Final Designation fails to quote that operative provision, and the parties, for differing tactical reasons, did not call this obvious matter of statutory interpretation to the panel's attention. Consequently, the majority's construction of the law derives solely from the definition of "critical habitat" and results in the following incorrect view of the ESA:



*Figure 2: The panel majority's erroneous belief that the ESA has no habitability requirement means that, as the panel majority held here, land that is uninhabitable by a species can nonetheless be its critical habitat.*

The ESA sets out the following path for the critical-habitat designation process: (1) determine whether the land in question is the species' habitat; (2) if so, determine whether any portion of that land meets the definition of critical habitat; and (3) if so, designate that portion of the species' habitat as its critical habitat. Erroneously, the panel majority begin and end with the definition of

critical habitat, asking only whether the land in question—even if uninhabitable by the species—satisfies the definition. That reasoning is fundamentally at odds with the ESA's text, properly read, and its regulations. The panel majority wound up sanctioning the oxymoron of uninhabitable critical habitat based on an incorrect view of the statute.

Two objections may be made to correcting this error. First, because the landowners didn't proffer this exact textual analysis in their habitability arguments, they waived it. Second, adopting this interpretation would conflict with a Ninth Circuit decision. Neither of these objections should be persuasive.

The first objection—that this textualist argument was waived—is easily disposed of. Throughout this litigation, the habitability issue, and the landowners' argument that the ESA requires a species' critical habitat to be habitable by that species, is well documented. Indeed, the best indication that the habitability issue is squarely presented is the panel majority's forceful rejection of any "habitability requirement" in the ESA. This court traditionally declines to address an issue only if it is not "adequately" briefed. *See, e.g.*, *United States v. Copeland*, 820 F.3d 809, 811 n.2 (5th Cir. 2016). Given the record, briefing, and panel majority's sweeping dismissal of a habitability requirement, the landowners' preservation of the habitability issue is anything but inadequate. Second, the logical consequence of accepting the objection would be that litigants could force courts to interpret statutory provisions in isolation by briefing arguments related only to those provisions. That result would conflict with our duty to consider statutory text in light of the statutory context. *See, e.g.*, *Serna v. Law Office of Joseph Onwuteaka, P.C.*, 732 F.3d 440, 450–51 (5th Cir. 2013) ("[T]he meaning of statutory language, plain or not, depends on context." (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991))); Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 167 (2012) ("The text must be construed as a whole."). Finally, relying on waiver would create a nonsensical world where the panel majority could cite statutory context and related regulations to say no habitability requirement exists,[5] but a reviewing court could not cite the same context and related regulations to say a habitability requirement does in fact exist. This objection is meritless.

The second objection—that accepting this statutory argument would conflict with the Ninth Circuit's view—is simply a consequence of a more precise textual interpretation. In *Bear Valley Mutual Water Co. v. Jewell*, 790 F.3d 977 (9th Cir. 2015), the Service designated unoccupied areas around the Santa Ana River as critical habitat for the Santa Ana sucker, a small fish. *Id.* at 993–94. Those areas were deemed essential to the sucker's conservation not because they are its habitat, but because they are "the primary sources of high quality coarse sediment for the downstream occupied portions of the Santa Ana River," and the sediment enhances the sucker's downstream habitat. *Id.* The court rejected the plaintiffs' argument that the areas did not qualify as critical habitat because they are uninhabitable. *Id.* The court believed that "[t]here is no support for this contention in the text of the ESA or the implementing regulation, which requires the Service to show that the area is 'essential,' without further defining that term as 'habitable.'" *Id.*

Two thoughts in response. First, as explained above, the "no support in the text of the ESA or implementing regulations for a habitability requirement" line is plainly wrong.

Second, enforcing the ESA's habitat provisions as written would not diminish the statute's protection of life-sustaining features that lie outside a

---

[5] *Markle Interests*, 827 F.3d at 468 ("There is no habitability requirement in the text of the ESA or the implementing regulations.").

species' critical habitat. The Ninth Circuit appeared to assume that critical-habitat designation of those unoccupied, uninhabitable areas was the only means of protecting the life-sustaining features. That is incorrect. Section 7 consultation is required to ensure that "any action authorized, funded, or carried out by" a federal agency is "not likely" to "result in the destruction or adverse modification of habitat of [endangered or threatened] species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2). Note that the "action" targeted by section 7 does not have to occur *on* designated critical habitat to trigger section 7 consultation; it only has to have the potential to *affect* critical habitat. Thus, if a landowner requested a permit to develop the unoccupied areas in *Jewell* in a way that might be likely to result in the destruction or adverse modification of the sucker's critical habitat downstream, an agency could not issue that permit without first going through section 7 consultation, regardless whether the unoccupied areas are designated as critical habitat. Consequently, the life-sustaining features would have nonetheless remained protected under the section 7 consultation requirements. Thus, the law protects critical habitat without the need to designate territory unoccupied by an endangered species as critical habitat.

\*     \*     \*

For these reasons, the panel majority were wrong to say that the ESA contains no habitability requirement. Correcting this error requires only three simple statements: (1) the ESA requires that land proposed to be designated as a species' critical habitat actually be the species' habitat—a place where the species naturally lives and grows or could naturally live or grow; (2) all parties agree that the dusky gopher frog cannot inhabit—that is, naturally live and grow in—Unit 1; therefore, (3) Unit 1 cannot be designated as the frog's critical habitat.

17

III. **Even Assuming No Habitability Requirement Exists, the Panel Majority Decision Is Wrong on the Standard for Unoccupied Critical Habitat**

Let us assume *arguendo* that the panel, like the parties, adequately examined the "critical habitat" definitions in section 1532(5)(A)(i)-(ii) without reference to the necessity of "habitability." Is the panel majority's interpretation correct? I submit that it is not for two reasons. First, the panel majority's test for unoccupied critical habitat is *less* stringent than the test for occupied critical habitat. That less stringent test conflicts with the ESA's text, drafting history, and precedent; together, these confirm the commonsense notion that the test for unoccupied critical habitat is designed to be *more* stringent than the test for occupied critical habitat. Second, although the majority opinion appears to recognize the dangerous breadth of its oxymoronic holding, it fails to offer any real limiting principles. The Service itself has actually rejected one suggested limitation, and the others are inapposite and toothless. Judge Owen's dissent well dissected these problems, but I add somewhat to her reasoning.

**A. The Test for Unoccupied Critical Habitat Is Supposed to Be More Demanding than the Test for Occupied Critical Habitat**

Suppose a dusky gopher frog camped out, by chance, on Unit 1. Maybe he got there after hiding from some inquisitive biologists on another property. Despite his fortuitous presence, Unit 1 could not be designated as critical habitat because, as the panel acknowledges, "occupied habitat must contain all of the relevant physical or biological features" essential to the frog's conservation. *Markle Interests*, 827 F.3d at 468 (quoting *Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 40 F. Supp. 3d 744, 761 (E.D. La. 2014)). Unit 1 lacks several of these essential features.

According to the panel majority, however, Unit 1 *is* "critical habitat" despite being *unoccupied* by the frog. Focusing solely on the presence of a

18

single allegedly essential feature (the "ephemeral ponds"), the panel majority make it *easier* to designate as critical habitat the land on which the species cannot survive than that which is occupied by the species. If correct, that remarkable and counterintuitive reading signals a huge potential expansion of the Service's power effectively to regulate privately- or State-owned land. Tested against the ESA's text, drafting history, and precedent, however, that reading is incorrect.

### 1. The ESA's Text

The ESA's text dictates that the unoccupied critical habitat designation is different and more demanding than occupied critical habitat designation. Occupied critical habitats are "specific areas . . . on which are found those physical or biological *features* . . . essential to the conservation of the species[.]" 16 U.S.C. § 1532(5)(A)(i) (emphasis added). Unoccupied critical habitats, in contrast, are "specific *areas*. . . [that] are essential for the conservation of the species." *Id.* § 1532(5)(A)(ii) (emphasis added). Congress deliberately distinguished between the two. For occupied habitat, the relevant specific areas contain physical or biological *features* essential to the conservation of a species. For unoccupied habitat, the specific *areas themselves* must be essential for the species' conservation.

Flowing from the difference in terminology between "features" and "areas," the burdens underlying the two types of designation are also different. A "feature" is defined as "a marked element of something" or a "characteristic."[6] "Area" is defined as "a clear or open space of land" or "a

---

[6] Webster's Third New International Dictionary 832 (1986). *See also* The Random House Dictionary of the English Language 520 (1969) ("a prominent or conspicuous part or characteristic").

definitely bounded piece of ground set aside for a specific use or purpose."[7] Given the narrower scope of "feature" than "area," it should be easier to prove two or three specific features are essential to a species' conservation (the occupied habitat standard) than an entire area (the unoccupied habitat standard). Suppose a eucalyptus tree is located in my yard. Whether the tree—a feature of my homestead—is essential to koala bear conservation would require an analysis of the tree's attributes only. But whether my homestead—a specific "area"—is "essential" to the species' conservation would be a more substantial undertaking. That analysis would assess not only the tree's attributes, but also the attributes of every constituent part—essential to the species' conservation or not—of my homestead. The analysis of an entire (unoccupied) area thus entails a broader and more complex investigation than an analysis of two or three features present in an area already occupied by the species. This is what the ESA requires.

### 2. The ESA's Drafting History

Before 1978, the ESA did not define critical habitat, but a regulation stepped in to define critical habitat as

> any air, land, or water area (exclusive of those existing man-made structures or settlements which are not necessary to the survival and recovery of a listed species) and constituent elements thereof, the loss of which would appreciably decrease the likelihood of the survival and recovery of a listed species or a distinct segment of its population. The constituent elements of critical habitat include, but are not limited to: physical structures and topography, biota, climate, human activity, and the quality and chemical content of land, water, and air. Critical habitat may represent any portion of the present habitat of a listed species *and may include additional areas for reasonable population expansion*.

---

[7] Webster's Third New International Dictionary 115 (1986). *See also* The Random House Dictionary of the English Language 79 (1969) ("any particular extent of surface; geographic region; tract" or "any section reserved for a specific function").

Interagency Cooperation, 43 Fed. Reg. 870, 874–75 (Jan. 4, 1978) (emphasis added). The last sentence of that definition was the genesis of the occupied-unoccupied dichotomy.

When Congress took up the critical habitat issue in 1978, members of both Houses expressed concerns about the Service's broad definition and its potential to expand federal regulation well beyond occupied habitat.[8] Not only did House and Senate members criticize the regulation, but Congress's final definition took a narrower approach to unoccupied habitat, severing unoccupied from occupied critical habitat and placing the respective definitions in separate provisions. [9] Mirroring the respective Houses' proposals, [10] Congress defined occupied critical habitat in terms of essential physical and biological *features*, and unoccupied critical habitat in terms of essential specific

---

[8] For those who find legislative history relevant, the committees charged with reviewing ESA legislation in both the House and Senate expressed these concerns. On the House side, the Committee on Merchant Marine and Fisheries reported H.R. 14104, which defined critical habitat largely according to the Service's regulation. *See* H.R. 14104, 95th Cong., at 23 (1978) (as reported by H.R. Comm. on Merchant Marine & Fisheries, Sept. 25, 1978). But it conspicuously excluded any reference to "additional areas for reasonable population expansion." *See id.* The committee report explains the deliberate exclusion by instructing "the Secretary [to] be exceedingly circumspect in the designation of critical habitat outside of the presently occupied area of the species." H.R. Rep. No. 95-1625, at 18 (1978).

On the Senate side, the Committee on Environment and Public Works complained that the "Service is now using the *same criteria* for designating and protecting areas to extend the range of an endangered species as are being used in designation and protection of those areas which are truly critical to the continued existence of a species." S. Rep. No. 95-874, at 9–10 (1978) (emphasis added). The committee thought that "[t]here seems to be little or no reason to give exactly the same status" to unoccupied critical habitat as to occupied critical habitat. *Id.* at 10. The danger of this parity, in the committee's view, was the resulting proliferation of critical habitats, which "increases proportionately the area that is subject to the regulations and prohibitions which apply to critical habitats." *Id.* Consequently, the committee directed the Service to reevaluate its designation processes. *Id.*

[9] *See* Endangered Species Act Amendments of 1978, Pub. L. No. 85-632, 92 Stat. 3751, 3751 (1978) (codified at 16 U.S.C. § 1532).

[10] *See* 124 Cong. Rec. 38,154, 38,159–60 (1978) (amendment of Representative Duncan to the definition of "critical habitat" immediately prior to the House vote); 124 Cong. Rec. 21,603 (1978) (text and passage of Senate Bill 2899).

*areas.* [11]   In so doing, Congress intentionally curtailed unoccupied critical habitat designation.

### 3.  Precedent

The Ninth Circuit has twice confirmed that unoccupied critical habitat is a narrower concept than occupied critical habitat.   In *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010), the Ninth Circuit considered whether the Service "unlawfully designated areas containing no [Mexican spotted] owls as 'occupied' habitat" instead of unoccupied habitat. *Id.* at 1161.  While the court ultimately rejected this argument on the ground that the habitat in question was in fact occupied, the Ninth Circuit *agreed* that the distinction between critical habitat designation of occupied and unoccupied land is significant:

> The statute thus differentiates between "occupied" and "unoccupied" areas, imposing a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species.

*Id.* at 1163.

Two months later, in *Home Builders Ass'n of Northern California v. United States Fish & Wildlife Service*, 616 F.3d 983 (9th Cir. 2010), *cert. denied* 562 U.S. 1217 (2011), the Ninth Circuit reiterated that the unoccupied critical habitat standard is "a *more demanding* standard than that of occupied critical habitat." *Id.* (emphasis added).  As a result, the court concluded that the Service's "basing the designation [of critical habitat] on meeting the *more demanding* standard [for unoccupied critical habitat] poses no problem." *Id.* (emphasis added).

---

[11] *See* Endangered Species Act Amendments of 1978, Pub. L. No. 85-632, 92 Stat. 3751, 3751 (1978) (codified at 16 U.S.C. § 1532).

District courts have consistently echoed this dichotomy. *See Ctr. for Biological Diversity v. Kelly*, 93 F. Supp. 3d 1193, 1202 (D. Idaho 2015) ("The standard for designating unoccupied habitat is more demanding than that of occupied habitat."); *All. for Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1138 (D. Mont. 2010) ("Compared to occupied areas, the ESA imposes 'a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species.'" (quoting *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1163)); *see also Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 44 (D.D.C. 2013) (referencing "the more demanding standard for unoccupied habitat"); *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 119 (D.D.C. 2004) ("Thus, both occupied and unoccupied areas may become critical habitat, but, with unoccupied areas, it is not enough that the area's features be essential to conservation, the area itself must be essential.").

In sum, we know from the ESA's text, drafting history, and precedent that an unoccupied critical habitat designation was intended to be *different* from and *more demanding* than an occupied critical habitat designation.

Against this backdrop, the panel majority misconstrue the statute and create a conflict with *all* relevant precedent. First, the panel majority read the word "areas" out of the definition of unoccupied critical habitat—"specific areas . . . [that] are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). The majority conclude that if *one feature* essential to a species' conservation is present in a specific area, then that specific area is "essential" for the conservation of the species. *Markle Interests*, 827 F.3d at 472 n.20. Congress, however, addressed *features* only with respect to occupied habitat. *See* 16 U.S.C. § 1532(5)(A)(i). With respect to unoccupied habitat, Congress adopted the far more expansive term "area." The panel majority's test—the

23

existence of one essential feature renders the area on which the feature exists essential to a species' conservation—collapses the definitions together by smuggling "feature" into the definition of unoccupied critical habitat.

Second, the panel majority's statutory interpretation not only disserves the Congressional purpose and relevant precedent—it is the opposite of what Congress declared. The majority say in one breath that proper designation of *occupied* critical habitat requires the existence of *all* physical and biological features essential to a species' conservation, but in the next breath they say that proper designation of *unoccupied* critical habitat requires only the existence of a single such feature. *See Markle Interests*, 827 F.3d at 468, 472 n.20. This kind of misinterpretation is, frankly, execrable, and contrary to the Supreme Court's Scalia-inspired and rather consistent adoption of careful textualist statutory exposition. (As Justice Kagan has recently declared, "We are all textualists now.")

Perhaps the most troubling aspect of this interpretive issue is that the panel majority refused to address it. The landowners argued in their principal and reply briefs that by statute, the critical habitat designation for unoccupied areas is more onerous than for occupied areas, and the *amici* dedicated their first argument to this point. Despite these forceful presentations, the panel majority still did not address the problem. Understandably, both the landowners and the 15 States reurge the question of statutory interpretation in rehearing petitions. For purposes of fundamental fairness and giving due consideration to the landowners' argument, the landowners deserve the answer they have not yet been given.

**B. There Are No Limiting Principles in the Panel Opinion**

But even if we, too, ignored that according to the statute, unoccupied critical habitat must be defined more narrowly, substantial problems would remain. In particular, if critical habitat designation of unoccupied areas

depends only on the existence of one feature essential to a species' conservation, then, as Judge Owen aptly points out, the Service has free rein to regulate any land that contains any single feature essential to some species' conservation. The panel majority appear to recognize this serious concern and respond by proffering a few limiting principles, but none of them is effective.

### 1. An Inadequacy Determination

The panel majority initially emphasize that "the Service had to find that the species's occupied habitat was inadequate before it could even consider designating unoccupied habitat as critical." *Markle Interests*, 827 F.3d at 470. Accordingly, this inadequacy requirement "provided a limit to the term 'essential' as it relates to unoccupied areas." *Id.* *See* 50 C.F.R. § 424.12(e) (2012) ("The Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species."). This is true, but misleading.

What the majority opinion does not acknowledge is that as of March 14, 2016, the Service intentionally eliminated the inadequacy requirement from its regulations. *See* Implementing Changes to the Regulations for Designating Critical Habitat, 81 Fed. Reg. 7414, 7434 (Feb. 11, 2016) (codified at 50 C.F.R. § 424.12 (2016)). The Service found that requirement "unnecessary and unintentionally limiting." *Id.* Whatever limiting effect the inadequacy requirement may have had in *this* case, that effect no longer remains.

### 2. Future "Undesignation" of Critical Habitat

A second alleged limiting principle is that "the ESA limits critical-habitat designations on the back end as well, because successful conservation through critical-habitat designation ultimately works towards undesignation." *Markle Interests*, 827 F.3d at 472 n.21. In other words, it is perfectly

25

permissible for the Service to designate areas unoccupied (and not capable of being occupied) by a species as critical habitat because it is possible the areas may sometime thereafter be "undesignated."

That reasoning essentially approves the Service's strong-arming private landowners into a catch-22. With their land saddled by a critical-habitat designation, private landowners have two choices: (1) refuse to cooperate with federal authorities but suffer the consequences by not being allowed to develop their land when federal permits are required, or (2) acquiesce in federal activity on their land to further the Service's interests. That it is theoretically possible for the critical habitat designation to be removed sometime in the future simply ignores the landowners' core concern that Unit 1 should have never been designated as critical habitat *in the first place*. This proposed limiting principle limits only the landowners and utterly misses the point.

### 3. "Scientific Consensus As to the Presence and Rarity of a Critical (and Difficult to Reproduce) Feature"

The panel majority proffer "rarity" as their third limiting principle. The panel majority "hold[] only" that property unoccupied by and unsuitable for the species may nevertheless be designated as critical habitat where there exists "a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature" that is "essential for the conservation of the dusky gopher frog." *Markle Interests*, 827 F.3d at 471. The panel majority insist that they create no "generalized [one-feature] rule" and focus only on the facts "*in this case*" which concern a critical "rare" feature. *Id.* at 472 n.20. This attempt to articulate a limiting principle is ungrounded and illusory.

To begin with, the roots of this limiting principle are dubious. If this were truly a limiting principle, one would expect it to play an important role in the panel majority's analysis. Yet the words "rare" and "rarity" appear only five times in the panel majority opinion. Even that number is deceptive

26

because one of the appearances is in the sentence quoted above that claims rarity as a limiting principle,[12] and the remaining four appearances merely reference the Service's statements[13]—leaving zero instances where the panel majority expressly builds its analysis on "rarity." Limiting principles should arise not from factual recitations, but instead from considered, original analysis of how a decision turns on the presence and absence of these facts. Therefore, without any analysis as to how a feature's rarity is critical to the panel majority's holding (and how lack of rarity would have made a difference), it is unclear how the scope of this opinion could be limited to cases involving rare, difficult-to-reproduce features.

This purported limiting principle is more dubious still. For all of the panel majority's dismissals of the landowners' and Judge Owen's arguments for their alleged lack of a textual basis in the ESA,[14] one would expect to find the panel majority's limiting principle grounded in the ESA's text. Wrong again. As with the word "feature," the words "consensus," "rare," "rarity," "difficult," and "reproduce" appear nowhere in the unoccupied critical habitat

---

[12] *Markle Interests*, 827 F.3d at 471.

[13] *Id.* at 466 ("[The Service] explained it prioritized ephemeral ponds because of their rarity and great importance for breeding, and because they are very difficult to replicate artificially."); *id.* (quoting the Service's description of the ponds as "rare" and "a limiting factor in dusky gopher frog recovery"); *id.* at 467 (quoting the Service's conclusion that Unit 1 provides "[b]reeding habitat for the dusky gopher frog in a landscape where the rarity of that habitat is a primary threat to the species[.]"); *id.* at 472 n.20 (referring to the Service's "summarizing [of] the scientific consensus [on] the rarity of" the ponds).

[14] *See, e.g.*, *id.* at 468 ("The statute does not support this argument. There is no habitability requirement in the text of the ESA or the implementing regulations."); *id.* ("The Landowners' proposed extra-textual limit on the designation of unoccupied land—habitability—effectively conflates the standard for designating *unoccupied* land with the standard for designating *occupied* land."); *id.* ("Thus, the plain text of the ESA does not require Unit 1 to be habitable."); *id.* at 469 ("Like their proposed habitability requirement, the Landowners' proposed temporal requirement . . . also lacks legal support and is undermined by the ESA's text."); *id.* at 470 ("The Landowners' focus on private-party cooperation as part of the definition of 'essential' finds no support in the text of the ESA."); *id.* at 470 n.17 ("We find no basis in the text of the statute for the 'reasonable probability' test introduced by the dissent . . . .").

definition. *See* 16 U.S.C. § 1532(5)(A)(ii). One must question the validity of a purported limiting principle that is unmoored from the ESA's text.

But even if we were to assume these threshold problems do not exist, the panel majority's limiting principle would still be illusory. When is a necessary feature rare *enough*? When is a necessary feature difficult *enough* to reproduce? What is a sufficient "scientific consensus"? Judges are ill-suited to decide such questions, especially when they arise from a test not rooted in statutory text. So long as the Service claims "scientific expertise" and offers "scientific support" using "the best scientific data available," *Markle Interests*, 827 F.3d at 472 (quoting 16 U.S.C. § 1533(b)(2)), it is easy to predict that judges will, like the panel majority, almost always defer to the Service's decisions. *See, e.g.*, *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) ("Where an agency's particular technical expertise is involved, we are at our most deferential in reviewing the agency's findings."). This limiting principle is likely nothing more than a hollow promise—a mirage of protection for landowners, but in reality a judicial rubber stamp on agency action.

Without some limiting principle that cabins the panel majority's one-feature-suffices standard, the Service's critical habitat designation power is virtually limitless. Here is a sample of physical and biological features that the Service has deemed essential to species' conservation: "[i]ndividual trees with potential nesting platforms,"[15] "forested areas within 0.5 mile (0.8 kilometer) of individual trees with potential nesting platforms,"[16] "aquatic

---

[15] Determination of Critical Habitat for the Marbled Murrelet, 81 Fed. Reg. 51,348, 51,356 (Aug. 4, 2016).

[16] *Id.*

28

breeding habitat,"[17] "upland areas,"[18] and "[a] natural light regime within the coastal dune ecosystem."[19] These are just a few of a myriad of commonplace "essential physical and biological features" that the Service routinely lists in its critical habitat designations. With no real limiting principle to the panel majority's one-feature-suffices standard, there is no obstacle to the Service's claiming critical habitat wherever "forested areas" or "a natural light regime" exist. According to the majority opinion, the Service has the authority to designate as critical habitat any land unoccupied by and incapable of being occupied by a species simply because it contains one of those features.

In the end, none of the panel majority's proffered limiting principles is persuasive, and its opinion threatens to expand the Service's power in an "unprecedented and sweeping" way. *See Markle Interests*, 827 F.3d at 481 (Owen, J., dissenting). Paraphrasing Justice Scalia, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

## IV. The Panel Majority Play Havoc with Administrative Law by Declaring the Service's Decision Not to Exclude Unit 1 Non-Judicially Reviewable

Agency action is presumptively judicially reviewable. Justice Kagan, writing for a unanimous Court two years ago, made precisely this point when she noted that "this Court has [] long applied a strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1653 (2015). The panel majority jettisoned that rule to find unreviewable the Service's decision not to exclude Unit 1 from critical habitat

---

[17] Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad, 81 Fed. Reg. 59,046, 59,102 (Aug. 26, 2016).

[18] *Id.*

[19] Designation of Critical Habitat for the Perdido Key Beach Mouse, Choctawhatchee Beach Mouse, and St. Andrew Beach Mouse, 71 Fed. Reg. 60,238, 60,249 (Oct. 16, 2006).

despite serious potential economic consequences. More confounding still, the panel majority contradict the Supreme Court's statement in *Bennett v. Spear*, 520 U.S. 154 (1997) that the Service's ultimate decision is reviewable for abuse of discretion. After providing background, I explain these problems.

## A. Background

Before the Service may designate critical habitat, the Service is required to consider various impacts that would flow from critical-habitat designation:

> The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. *The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.*

16 U.S.C. § 1533(b)(2) (emphasis added).

In this case, the Service commissioned a report to fulfill its duty to consider economic impact.[20] Over the first 59 pages, the report explained its methodology and the serious potential economic impacts of critical-habitat designation. Report at 1–59. One shocking fact is that the landowners could suffer up to $34 million in economic impact. Report at 59. Another shocking fact is that there is virtually nothing on the other side of the economic ledger. The Final Designation emphasized that the report "discusses the potential economic benefits associated with the designation of critical habitat." Final Designation, 77 Fed. Reg. at 35,141. That discussion appears on all of about

---

[20] The report is available here: https://www.regulations.gov/document?D=FWS-R4-ES-2010-0024-0157. The page numbers cited above refer to the page numbers of the PDF.

two pages in the report, and speculates that such benefits may come from "individuals' willingness to pay to protect endangered species" and "the public [] hold[ing] a value for habitat conservation." Report at 60–62. Other benefits, the report claimed, might include "open space," "[s]ocial welfare gains [] associated with enhanced aesthetic quality of habitat," and "[d]ecreased development." Report at 61. Given the weakness and speculative nature of these purported benefits, it is unsurprising that this discussion was relegated to the very end of the report. The report ends—abruptly with no weighing or comparison of costs or benefits, and no discussion of how designating Unit 1 as critical habitat would benefit the dusky gopher frog.

The Service recognized the problems in the report and attempted to remedy them in the Final Designation, as it explained that "the direct benefits of the designation [of critical habitat for the dusky gopher frog] are best expressed in biological terms." Final Designation, 77 Fed. Reg. at 35,141. The Service continued, "Our economic analysis did not identify any disproportionate costs that are likely to result from the designation. Consequently, the Secretary is not exercising his discretion to exclude any areas from this designation of critical habitat for the dusky gopher frog based on economic impacts." *Id.*

The landowners perceived two problems with those statements in the Final Designation. First, the Service said the direct benefits of designation are best expressed in biological terms, but the Service never explained "in biological terms" how designation of Unit 1 as critical habitat would directly benefit the dusky gopher frog. Second, the Service said there were no "disproportionate costs," but the Service never performed a comparison of the relevant costs. Yet the Service "[c]onsequently" based its decision not to exclude Unit 1 from critical habitat on those two statements. Final

Designation, 77 Fed. Reg. at 35,141. "At the very least," the landowners thus argued, "a reviewing court could consider whether the Service 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise'" (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983)). The landowners summarized their argument on the Service's failure to provide adequate reasons as follows: "Because the Service failed to articulate reasons for its decision, the rule must be vacated as to Unit 1. As currently framed, the decision is plainly arbitrary."

The panel majority disposed of this issue by holding that "the Service's bottom-line conclusion not to exclude Unit 1 on the basis of [] economic impact" "is not reviewable." *Markle Interests*, 827 F.3d at 475. The panel majority reasoned that the ESA is "silent on a standard for reviewing the Service's decision to *not* exclude an area," and thus "[t]hat decision is committed to the agency's discretion and is not reviewable." *Id.* at 474.

## B. Problems with the Panel Majority Opinion

The panel majority falter at the starting line by never recognizing or applying the—as Justice Kagan put it—"strong presumption favoring judicial review of administrative action." *Mach Mining, LLC*, 135 S. Ct. at 1653. This presumption "is not easily overcome," *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 235 (5th Cir. 2015), and it is certainly not overcome by the panel majority's nod to *Heckler v. Cheney*, 470 U.S. 821 (1985), which concerned the unique (and dissimilar) context of enforcement discretion.[21]

---

[21] The presumption is also not overcome by the panel majority's protests that there are no manageable standards by which we can review the Service's decision not to exclude Unit 1. After all, the Service's decision *not to exclude* Unit 1 is really part and parcel of the Service's decision *to include* Unit 1, and no one disputes—or can dispute—that the Service's decision to include Unit 1 as critical habitat is judicially reviewable. The entire provision should be interpreted holistically. The panel majority say the ESA "is silent on a standard for reviewing the Service's decision to *not* exclude an area," but there is plainly a standard for reviewing the Service's decision to *include* an area. It

But more troubling still, the panel majority's holding places this court in tension with the Supreme Court, which has previously stated that the Service's ultimate decision is reviewable for abuse of discretion. In *Bennett v. Spear*, 520 U.S. 154, 172 (1997), the Court held that the Service's consideration of economic impact of critical-habitat designation is mandatory, not discretionary. The Service had based its argument in favor of discretion on the ESA's permissive language: "[t]he Secretary *may* exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Id.* (quoting 16 U.S.C. § 1533(b)(2)). The Court rejected that argument, stating that "the fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical *requirement* that, in arriving at his decision, he 'tak[e] into consideration the economic impact and any other relevant impact,' and use 'the best scientific data available.'" *Id.* (quoting 16 U.S.C. § 1533(b)(2)). In other words, regardless whether the Service properly considers economic impact, the Service's ultimate decision regarding designation of critical habitat is reviewable for abuse of discretion.

The panel majority opinion clashes with *Bennett*'s holding that the Service's "ultimate decision" is reviewable for abuse of discretion. Oddly (given the panel majority's numerous references to *Bennett*, *see Markle Interests*, 827 F.3d at 460, 462, 464, 474), the panel majority never confront, much less distinguish, *Bennett*. But it is telling that intervenors on the side of the Service—the Center for Biological Diversity and the Gulf Restoration Network—acknowledged, citing *Bennett*, that "[e]ven if the decision not to

---

mandates consideration of economic impacts, national security impacts, and any other relevant impacts of critical-habitat designation. *See* 16 U.S.C. § 1533(b)(2). And the decision to exclude an area is based on cost-benefit analysis. *Id.*

exclude could be reviewed, FWS's decision can be reversed only if it abused its discretion." The panel majority never engaged *Bennett*'s clear signal that the Service's decision is reviewable.

The landowners maintain that the Service's decision to include Unit 1 was procedurally flawed, and, pursuant to the presumption of judicial review and *Bennett*, that decision is judicially reviewable, if only under the narrow arbitrary and capricious standard. The panel majority's refusal to conduct judicial review is insupportable and an abdication of our responsibility to oversee, according to the APA, agency action.

## V.  Conclusion

Each of the three issues highlighted in this dissent illustrates the importance of further review. The panel majority's non-textual interpretations of the ESA misconstrue Congress's efforts to prescribe limits on the designation of endangered species' habitats and encourage aggressive, tenuously based interference with property rights. The majority's disregard for the presumption of judicial review, effectuated in the ESA's text and by *Bennett*, deprives states and private landowners of needful protection by the federal courts.

For these reasons, I respectfully dissent.